Stephen B. SCALLEN and Chacke Y. Scallen, Appellants,

v.

COMMISSIONER OF INTERNAL REVENUE, Appellee.

No. 88–2323.

United States Court of Appeals, Eighth Circuit.

Argued April 12, 1989.

Decided June 9, 1989.

David R. Brennan, Minneapolis, Minn., for appellants.

Steven W. Parks, Washington, D.C., for appellee.

Before FAGG, Circuit Judge,
FLOYD R. GIBSON and TIMBERS,* Senior Circuit Judges.

TIMBERS, Circuit Judge.

Stephen B. Scallen (Scallen) and Chacke Y. Scallen (collectively appellants) appeal from a decision (No. 6913–85) entered May 26, 1988 in the United States Tax Court, Mary Ann Cohen, *Judge*,[1] determining deficiencies totaling $555,220 in appellants' federal income tax for the tax years 1976, 1977, 1979 and 1981. The court also imposed on Scallen[2] additions to tax of $409,525 as civil fraud penalties pursuant to Int.Rev.Code of 1954, § 6653(b),[3] on the ground that some of the underpayment of tax in each year in which a deficiency was determined was attributable to fraud.

Scallen is a tax attorney and law professor who also has engaged in extensive real estate activities. These activities have generated millions of dollars in management fees, gross rental receipts and income from the sale and exchange of real property. Despite this sizeable revenue, appellants reported large net operating losses (NOLs) on their tax returns for each tax year from 1971 through 1981. They paid no income tax for these tax years.

The Commissioner of Internal Revenue began an examination and audit of appellants' tax returns and assessed large deficiencies for the tax years 1976 through 1981. Appellants challenged the deficiencies by filing a petition in the Tax Court.

The parties originally disputed forty-four separate issues. These were narrowed to

---

* Of the Second Circuit, sitting by designation.

1. The original tax court memorandum decision (No. 1987–412), 54 T.C.M. (CCH) 177 (1987), was entered August 24, 1987. The decision calculating the tax deficiencies and penalties owed by appellants subsequently was entered May 26, 1988.

2. No additions to tax due to fraud have been imposed on Chacke Y. Scallen. Mrs. Scallen appears to have been completely uninvolved in Scallen's real estate activities. Her liability for the deficiencies has resulted solely from appellants' filing of joint tax returns for the tax years in question.

3. Unless otherwise stated, all statutory citations in this opinion are to sections of the Internal Revenue Code of 1954 as amended, which in turn correspond to sections of Title 26 of the United States Code, 1982 codification.

For example, here, Int.Rev.Code of 1954, § 6653(b), 26 U.S.C. § 6653(b) (1982). We would cite it hereafter as § 6653(b).

the twenty-four issues decided by the Tax Court in its memorandum decision of August 24, 1987 (August 24 decision). 54 T.C.M. (CCH) 177 (1987). Most of these issues were decided against appellants. On appeal, appellants have challenged only (1) the imposition in the August 24 decision of the 50% civil fraud penalty pursuant to § 6653(b) for each of the four tax years in which the Tax Court determined a deficiency; (2) the Tax Court's determination of two of the twenty-three other issues disposed of in the August 24 decision; and (3) the Tax Court's order denying appellants' posttrial motion to elect income averaging pursuant to §§ 1301–1304 for the tax years 1977, 1979 and 1981.

For the reasons which follow, we affirm the decision of the Tax Court.

## I.

We summarize only those facts and prior proceedings believed necessary to an understanding of the issues raised on appeal.

## A.

Early in his career Scallen worked as a tax attorney and law professor. He graduated from the University of Minnesota Law School (the law school) in 1959, graduating third or fourth in a class of about seventy. He was president of the law review and a member of the Order of the Coif. From 1959 to 1961, he was a tax associate at the Washington D.C. law firm of Covington and Burling. In 1961, Scallen joined the faculty of the law school and remained on the faculty throughout the period in question. He taught various courses in business, real estate and federal tax law. He has written at least three articles for professional legal publications on income tax issues. He was an assistant dean at the law school from 1961 to 1965. In 1965 and 1966, he was a Graduate Fellow at the

Harvard Law School where he did research and studied income taxation.

Beginning in 1966, Scallen became involved in the real estate business in Minneapolis. His activities included buying and selling real estate, developing apartment complexes and condominiums, syndicating and managing real estate partnerships, arranging real estate financing, and managing real estate rental properties. His real estate activities became quite extensive. At one point between 1974 and 1978, he either owned, controlled or had an interest in approximately nineteen partnerships, six corporations and eleven sole proprietorships. These entities generated millions of dollars in revenue from the sale or exchange of real estate, management fees and gross rental receipts.

## B.

Despite the potentially large income indicated by Scallen's real estate activities, appellants reported large NOLs for each tax year from 1971 through 1981 and paid no income tax for those tax years. In late 1978 or early 1979, the Commissioner began an examination and audit of appellants' tax returns. On December 20, 1984, the Commissioner issued to appellants two statutory notices of tax deficiency—one for the tax years 1976, 1977 and 1978, and the other for the tax years 1979, 1980, and 1981.[4] The Commissioner also examined appellants' tax returns for the tax years 1973, 1974 and 1975, because the large NOLs appellants reported in those years were carried forward as deductions on their tax returns for the tax years 1976 through 1981.

Appellants challenged the Commissioner's assessments by filing a joint petition in the Tax Court. The case was tried in the Tax Court on appellants' petition on June 20, 23 and 24, 1986. The issues litigated at the trial were decided in the August 24 decision. On May 26, 1988, the Tax Court

---

4. The notice of deficiency for the tax years 1976, 1977 and 1978 set forth an addition to Scallen's tax pursuant to § 6653(b), but the notice of deficiency for the tax years 1979, 1980 and 1981 set forth no such addition to Scallen's tax. The Commissioner, however, claimed an addition to tax pursuant to § 6653(b) for the tax years 1979, 1980 and 1981 in his answer to Scallen's Tax Court petition.

entered its decision setting forth its final determinations of appellants' tax deficiencies and the additions to tax owed by Scallen pursuant to § 6653(b). Appellants filed a notice of appeal to our Court on August 29, 1988. They challenged the Tax Court's rulings on only three of the twenty-four issues decided by the Tax Court in the August 24 decision. On appeal we find that appellants assert two principal claims of error: the imposition pursuant to § 6653(b) of the 50% fraud penalty for each of the four years involved and the treatment of the gain from the sale of certain real estate. They also assert a number of subordinate claims of error, each of which we shall discuss.

### C.

As their first claim of error appellants challenge on two grounds the Tax Court's imposition of the 50% civil fraud penalty pursuant to § 6653(b) for each of the four years in which the court determined a deficiency. First, they assert that the Commissioner failed to meet his burden of proving fraud by clear and convincing evidence. The Tax Court, however, held that the Commissioner had met his burden of proving fraud. The court pointed to several factors relevant to the issue of fraud. They included Scallen's use of a large number of entities to do business, his cash management methods which made it difficult to trace income, his failure to maintain accurate and complete records, his failure to produce records during discovery, and his handling of several deductions, especially those for bad debts. The court rejected appellants' arguments that their tax deficiencies were the result of honest errors or positions taken in good faith. The court observed that Scallen was a law professor who had taught and practiced tax law.

Second, appellants challenge the imposition of the fraud penalty on the ground that the Commissioner failed to prove that the tax deficiencies that the Tax Court

found to be fraudulent (the fraud items) actually caused an underpayment of tax for each of the four tax years in question. Appellants assert that most of their tax deficiencies were not attributable to fraud (the non-fraud items), and that these non-fraud items alone were large enough to generate the originally reported NOLs that appellants claimed entitled them to pay no taxes. They argue that the fraud items did not cause their underpayment of taxes, because even with the fraud items removed from their original tax calculations they still would have reported NOLs for each tax year in question and for which they paid no taxes. The Commissioner asserts that appellants' contention is contrary to the statutory language and the congressional policy expressed in § 6653(b).

### D.

Appellants' second claim of error arises out of the Tax Court's treatment of the gain from the sale of certain real estate. In 1977, Scallen purchased a 114–unit apartment/hotel known as the Mark Twain Hotel/Brittany Apartments (Brittany). In January 1979, Scallen sold Brittany to Gerald Hansen (Hansen) and realized a $760,104 gain (the sale or the January 1979 sale).[5] The next day Hansen sold Brittany to Bradley Herman (Herman). Herman held Brittany until November 1979 when he sold it back to Scallen. Since he repurchased the property, Scallen treated this sale on appellants' 1979 return as a nullity and reported only that portion of the gain on the sale ($172,300) that he received in cash, stepping up his basis in Brittany accordingly. The Tax Court rejected this approach and required appellants to report the entire gain on their 1979 return.

At trial, appellants asserted that, if the Tax Court rejected their treatment of the gain from the January 1979 sale, they were entitled to elect to report the gain from the sale under the installment method of reporting income set forth in § 453(b). They also asserted that they could treat the reac-

---

**5.** The Tax Court found that Scallen sustained a loss of $203,749 on his resale of Brittany in 1980 following his repurchase of the property in 1979. Accordingly, he was required to report a net gain of $556,335 on his Brittany transactions.

quisition of the building as a repossession under § 1038. By invoking a combination of the two statutes they asserted that they could shift much of the net gain to tax year 1980 when Scallen resold the building.[6] The Tax Court rejected both appellants' original claim and their alternate claim that they could report the gain from the sale under § 453(b) and § 1038. The court held that the entire net gain was taxable in 1979. Appellants challenge on appeal the Tax Court's rulings concerning § 453(b) and § 1038. The Commissioner asserts that the Tax Court correctly decided the issue since neither § 453 nor § 1038 is available to appellants upon the facts of this case.

### E.

This brings us to several subordinate claims of error asserted by appellants on appeal.

First, Scallen challenges the Commissioner's treatment of certain income earned in 1981 as ordinary income and not as a capital gain. In January 1981, thirteen condominium units which Scallen was about to sell were transferred by him from Campus Realty, Inc. (Campus Realty), an entity wholly owned by him, to Interfund, Inc. (Interfund), another entity wholly owned by him and which prior to the transfer had virtually no assets. The Tax Court treated this transfer as a contribution to Interfund's capital. Later that year, Interfund sold nine of the units, realizing a profit of which a portion was paid to Scallen. This payment was treated by the Tax Court as a distribution of dividends from Interfund. Scallen transferred back to Campus Realty the four remaining units; this transfer was treated by the Tax Court as a distribution to Scallen of the remaining capital in Inter-

fund. Since the value of the four units was greater than Scallen's remaining basis in Interfund, the difference was treated as a gain with respect to Scallen's capital contribution to Interfund.

Appellants do not challenge any of the facts set forth in the preceding paragraph. They do challenge, however, the Tax Court's treatment of Interfund as a collapsible corporation as provided for in § 341, thus resulting in the gain being treated as ordinary income rather than as a capital gain.[7] Appellants assert that Scallen already had sold nine of the thirteen units prior to the transfer of the remaining four units back to Campus Realty, as a result of which Scallen already had realized more than 60 percent of the possible taxable income from the sale of the thirteen units. For this reason, appellants argue that Interfund cannot be treated as a § 341 collapsible corporation.[8] The Commissioner argues that, since appellants did not challenge in the Tax Court the treatment as ordinary income of the gain on the transfer of the four units back to Campus Realty, they cannot raise the issue on appeal.

### F.

Second, appellants challenge the Tax Court's denial of their posttrial motion to amend their petition to elect income averaging under §§ 1301–1304 for the tax years 1977, 1979 and 1981. On March 28, 1988— 21 months after trial and seven months after the entry of the August 24, 1987 decision—appellants filed their motion to elect income averaging. On May 20, 1988, the Tax Court denied the motion on the grounds that it was untimely and prejudicial to the Commissioner and appellants'

---

6. Under Scallen's analysis, he would report $92,-703 of the net gain in 1979, and the remaining $463,652 of the net gain in 1980.

7. Under § 341, if a corporation is formed to receive the income from certain property, and the stock is distributed before a substantial part of the income from the property is realized, the corporate facade is "collapsed" and the gain in the value of the stock is treated as ordinary income rather than as a capital gain. The statute precludes the use of the corporate form to

convert ordinary income into capital gains. *Braustein v. Commissioner*, 374 U.S. 65, 70–71 (1963).

8. In 1981, it was the Commissioner's position that if more than one-third of the taxable income from the corporation had been realized prior to distribution of the capital, the corporation was not collapsible. Rev.Rul. 72–48, 1972–1 C.B. 102.

tax under income averaging could not be calculated properly on the present record.

Appellants assert that the Tax Court abused its discretion in denying the motion because all of the information necessary for income averaging was available in the record and the motion was not untimely. The Commissioner asserts that the Tax Court was correct in ruling that the motion was untimely and that the Commissioner would have been prejudiced if appellants' motion had been granted since he did not raise at trial certain issues which he would have raised had he known that appellants would request income averaging.

For the reasons which follow, we affirm the Tax Court's decision in all respects.

## II.

### A.

With the foregoing summary of the facts and prior proceedings in mind, we turn next to the question of whether the Tax Court correctly imposed on Scallen an addition to tax under § 6653(b) on the ground that some of the underpayment of tax in each year in which a deficiency was determined was attributable to fraud.

■ During the tax years in question, § 6653(b) provided in relevant part:

"If any part of any underpayment ... of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment."

As in the instant case, the penalty provided for in § 6653(b) may be assessed against the entire underpayment of tax for a given year, even if only part of the underpayment is attributable to fraud. *Loftin and Woodard, Inc. v. United States,* 577 F.2d 1206, 1236 (5th Cir.1978); *Ruidoso Racing Assoc. v. Commissioner,* 476 F.2d 502, 505 (10th Cir.1973); *Mensik v. Commissioner,* 328 F.2d 147, 150 (7th Cir.), *cert. denied,* 379 U.S. 827 (1964). "It is not necessary that the Commissioner prove the precise amount of the underpayment resulting from fraud but only that 'any part' thereof is attributable to fraud". *Ruidoso, supra,* 476 F.2d at 505. The penalty may be im-

posed as a result of a fraudulent underpayment of taxes resulting from either an understatement of income or an overstatement of deductions. *Hicks Co. v. Commissioner,* 56 T.C. 982, 1019 (1971), *aff'd,* 470 F.2d 87 (1st Cir.1972); *Neaderland v. Commissioner,* 52 T.C. 532, 540 (1969), *aff'd,* 424 F.2d 639 (2d Cir.), *cert. denied,* 400 U.S. 827 (1970). The fraud penalty is "provided primarily as a safeguard for the protection of the revenue and to reimburse the Government for the heavy expense of investigation and the loss resulting from the taxpayer's fraud". *Helvering v. Mitchell,* 303 U.S. 391, 401 (1938) (50% civil fraud penalty provided for in Revenue Act of 1928, § 293(b)); *Ruidoso, supra,* 476 F.2d at 507.

■ The burden of proving fraud is upon the Commissioner who must prove it by clear and convincing evidence. § 7454(a); Tax Court Rule 142(b); *see also Rechtzigel v. Commissioner,* 703 F.2d 1063, 1064 n. 2 (8th Cir.1983) (per curiam); *cf. Lessmann v. Commissioner,* 327 F.2d 990, 993 (8th Cir.1964) (decided under Int.Rev.Code of 1939, § 1112); *Schroeder v. Commissioner,* 291 F.2d 649, 653 (8th Cir.1961) (same), *cert. denied,* 368 U.S. 985 (1962). A Tax Court finding of fraud is one of fact which will be overturned only if it is not supported by substantial evidence on the record as a whole, or if it is clearly erroneous or induced by an erroneous view of the law. *Estate of Gryder v. Commissioner,* 705 F.2d 336, 338 (8th Cir.), *cert. denied,* 464 U.S. 1008 (1983); *Banks v. Commissioner,* 322 F.2d 530, 537 (8th Cir.1963); *Schroeder, supra,* 291 F.2d at 653.

### B.

■ Appellants attack the Tax Court's finding of fraud on several grounds. They assert that in general the finding of fraud is not supported by substantial evidence. Our reading of the Tax Court's August 24 opinion, however, refutes this. We agree

with the Tax Court that "the record is replete with clear and convincing evidence of fraud in each of the years in issue". Since direct evidence of fraud rarely is available, fraud may be proved by circumstantial evidence. *Klassie v. United States*, 289 F.2d 96, 101 (8th Cir.1961).

In the instant case there was an abundance of substantial circumstantial evidence of fraud, including several of the traditional "badges of fraud". The "badges" here include the consistent and sizeable underreporting of income[9], the failure to keep proper books and records, the failure to produce many records during discovery[10], and the structuring of a business and use of a cash management method which made difficult the tracing of income. *Spies v. United States*, 317 U.S. 492, 499 (1943); *Lessmann, supra*, 327 F.2d at 993; *Schroeder, supra*, 291 F.2d at 653; *Klassie, supra*, 289 F.2d at 101. *See also Solomon v. Commissioner*, 732 F.2d 1459, 1461–62 (6th Cir.1984) (per curiam); *Loftin, supra*, 577 F.2d at 1238–39. These badges are present in the four tax years in which the Tax Court determined deficiencies, as well as in the NOLs appellants

claimed for tax years 1973, 1974 and 1975 which appellants carried forward as deductions into the years in which there were tax deficiencies.

Appellants also assert that there are innocent explanations for all of the above irregularities. They contend that the irregularities were the result of honest errors committed by Scallen or his accountant, Donald J. Hamm (Hamm), or were the result of positions taken in good faith with support in the law. They also contend that Scallen's business methods were not designed with an intent to evade the income tax. The Tax Court rejected these contentions. We cannot say that the Tax Court was clearly erroneous in this respect. Our holding in this respect is based on the following considerations.

■ Scallen is an attorney with extensive experience in income tax matters. He practiced tax law for two years. He taught tax courses at the law school during the tax years in question.[11] He has written at least three legal articles on tax related subjects.[12] The intelligence and sophistica-

---

**9.** As stated by the Commissioner, the difference between the net operating losses reported by appellants on their tax returns and the correct income as found by the Tax Court (which appellants do not challenge) is sizeable. The table below shows the net operating loss reported in each tax year, the correct income as found by the Tax Court for that year, and the difference between the two. Figures indicated in parentheses depict net operating losses.

| Year | Reported Taxable Income | Correct Taxable Income | Difference |
|------|------------------------|------------------------|------------|
| 1976 | ($890,197) | ($164,225) | $725,972 |
| 1977 | ($429,542) | $162,340 | $591,882 |
| 1978 | ($562,243) | ($26,783) | $535,460 |
| 1979 | ($652,214) | $365,371 | $1,017,585 |
| 1980 | ($1,065,502) | ($420,189) | $645,313 |

Although appellants' correct taxable income for the tax year 1976 still shows a NOL, the Tax Court determined that appellants owed $13,255 as a minimum tax for that tax year, pursuant to §§ 56–59.

**10.** Between December 1985 and April 1986 the Commissioner, first informally and later through a formal document discovery demand, requested a large number of documents from appellants. When appellants failed to produce these documents, the Tax Court imposed sanctions on appellants precluding them from introducing in evidence any of the requested documents that they had failed to produce.

**11.** Scallen taught a course known as "Tax I" in the Spring of 1977, 1979, 1980, and in the Fall of 1981. He taught a course known as "Tax II" in the Spring of 1978 and the Winter of 1980–81.

He also taught such courses as "Real Estate Planning", "Business Planning", and "International Tax". The course descriptions in the record reveal that these courses contained tax instruction as part of their curriculums. In 1980, Scallen also taught a Continuing Legal Education (CLE) course in "Real Estate Planning: Tax Free Exchanges", and during the tax years in question he participated as a student in several CLE courses in which taxation was part of the curriculum.

**12.** Scallen, *Federal Income Taxation of Professional Associations and Corporations*, 49 Minn. L.Rev. 603 (1965) (114 page article); Scallen, *The Deductibility of Antitrust Treble Damage Payments*, 52 Minn.L.Rev. 1149 (1968); Scallen, *The Professional Association*, 1970 Inst. on Est. Plan. ¶ 70.1100–.1113.

tion of the taxpayer—especially his knowledge of the tax laws—is an important factor in determining whether he committed fraud. *Solomon, supra,* 732 F.2d at 1461–62; *Considine v. United States,* 645 F.2d 925, 931–32 (Ct.Cl.1981), *cert. denied,* 459 U.S. 835 (1982); *O'Connor v. Commissioner,* 412 F.2d 304, 310 (2d Cir. 1969), *cert. denied,* 397 U.S. 921 (1970); *Lessmann, supra,* 327 F.2d at 995; *Owens v. United States,* 197 F.2d 450, 451 (8th Cir.1952).

■ Appellants rely to some extent on the defense that errors in their returns were attributable to mistakes made by Hamm. Both Scallen and Hamm testified, however, that Scallen often failed to provide documentation for many of the deductions and transactions which later were found to be erroneous by the Tax Court. Indeed, Hamm often asked for such documentation, but to no avail. A taxpayer may not rely on errors of his tax preparer as a defense to a charge of fraud if the taxpayer failed to provide the preparer with the proper documentation correctly to prepare the return. *Foster v. Commissioner,* 391 F.2d 727, 732–33 (4th Cir.1968); *Estate of Temple v. Commissioner,* 67 T.C. 143, 162 (1976).

Scallen also asserts that he did not properly document many of the deductions he claimed or the transactions in which he engaged because appellants were having such large NOLs that he believed it unlikely that they would owe any tax. We find it difficult to believe, however, that a taxpayer with Scallen's knowledge of tax law would not appreciate the importance of maintaining proper records before claiming deductions or engaging in the transactions that he did, no matter what the apparent potential tax liability.

Appellants also assert that, contrary to the Tax Court's findings, Scallen did not structure his business operations to evade the income tax. Scallen did business through a large number of entities which he either completely owned or which he controlled through ownership of a substantial interest. He asserts that the number of entities was necessary for various legitimate reasons, including limitation of liability, separation of investors and their specific properties from each other, and use of the corporate form to avoid the limitations of the Minnesota usury laws.

The Tax Court found, however, that his use of numerous entities raised an inference of fraudulent intent to evade taxes. There is support for this finding. Scallen used a single "cash hub" checking account for all of his business entities. This made it difficult and sometimes impossible to trace the cash flow among the large number of entities and Scallen himself. One of the Commissioner's agents testified that, while he generally could determine the income of the various entities, "the income that should have been reported by Mr. Scallen and kept track of on his own set of books, that could not be traced". The "handling of one's affairs to avoid making the records usual in transactions of the kind" is an indication of an intent to evade taxes. *Spies, supra,* 317 U.S. at 499. While a finding of fraud could not be supported solely on the ground that the taxpayer did business through a large number of entities, in the instant case this is another piece of the substantial circumstantial evidence of Scallen's intent to avoid the income tax.

For the foregoing reasons, we hold that there was substantial evidence to support the Tax Court's finding that "the record is replete with clear and convincing evidence of fraud in each of the years in issue". The question of Scallen's fraudulent intent, "if at all doubtful, is ordinarily one of fact for the trier of the facts". *Owens, supra,* 197 F.2d at 451. The finding on this question by the trier of the facts is not clearly erroneous.

### C.

■ Appellants also challenge the Tax Court's finding of fraud on a second ground. They assert that for each of the tax years in which the Tax Court determined a deficiency they originally reported large NOLs and paid no taxes. They now contend that the Commissioner's proof of

fraud in those years was insufficient because he did not establish that the portion of the NOLs attributable to fraud items in each year was greater than the NOLs attributable to non-fraud items. They further contend that, if the NOL attributable to fraud items for any given year is less than the NOL attributable to non-fraud items, and the NOL attributable to fraud items is ignored, there would still remain a NOL for the year and no payment of taxes would be required, even if the remaining NOL is attributable to wrongly computed non-fraud items later disallowed by the Tax Court. They contend, accordingly, that it cannot be said that fraud caused the underpayment of tax, since no tax would have been due in any event because of the remaining NOL attributable to non-fraud items.

Although this argument may be thought to have a certain surface appeal, we believe that it ultimately is unavailing. The argument is based on the premise that the only deductions and reductions in income tainted by fraud were certain disallowed deductions and reductions in income specifically designated as fraudulent by the Tax Court.[13] A reading of the Tax Court's opinion, however, demonstrates that the items cited as fraudulent were set forth as examples. The Tax Court considered most of appellants' deficiencies to be tainted by Scallen's fraud. As stated above, this general finding of fraud is supported by substantial evidence. Even if we were to accept appellants' novel theory that a majority of the NOLs must be attributable to fraud items before it can be said that some portion of the underpayment of taxes was caused by fraud, this requirement has been met in the instant case.

In any event, we do not believe that there is any support for appellants' reading of § 6653(b).[14] The plain language of § 6653(b) requires that the fraud penalty be imposed if the Commissioner shows that "any part" of the underpayment of taxes "is due to fraud". The Tax Court found that appellants substantially underpaid their taxes in 1976, 1977, 1979 and 1980, and that at least part of the reason for the underpayment in each of the four years was Scallen's fraud. There is substantial evidence to support that finding. That is all that the plain language of the statute requires.

Moreover, appellants' reading of the statute is inconsistent with the policies behind the statute, namely, to protect the revenue and compensate the government for the costs of investigating appellants' fraud and for other losses caused by the fraud. *Mitchell, supra,* 303 U.S. at 401; *Ruidoso, supra,* 476 F.2d at 507. The statute clearly is designed to deter taxpayers from defrauding the Commissioner. We do not believe that it would be consistent with these policies or with the language of the statute to permit Scallen to commit fraud in his tax returns and then to allow him to escape liability for the fraud through the fortuitous circumstance that less than half of the erroneously claimed NOLs were attributable to fraud items. That would neither protect the revenue nor compensate the government for the costs of Scallen's fraud.

We hold that there is substantial evidence in the record as a whole to support the Tax Court's imposition of the 50% civil fraud penalty against Scallen for appellants' entire underpayment of taxes for the tax years 1976, 1977, 1979 and 1981.

---

13. Many of these disallowed deductions and transactions found to be tainted by fraud occurred in tax years 1973, 1974 and 1975 and helped to create the large NOLs that were carried forward as deductions into each of the four tax years in which deficiencies were determined.

14. Appellants cite several cases in support of their interpretation of § 6653(b). *Lawn v. United States,* 355 U.S. 339, 361 (1958); *Considine, supra,* 645 F.2d at 931; *Loftin, supra,* 577 F.2d at

1236–45; *Cohen v. Commissioner,* 266 F.2d 5, 12 (9th Cir.1959); *Ehlers v. Vinal,* 253 F.Supp. 58, 66–68 (D.Neb.1966), *aff'd,* 382 F.2d 58 (8th Cir. 1967); *Barrier v. Commissioner,* 46 T.C.M. (CCH) 100, 109–10 (1983). These cases, however, for the most part state the general rules set forth above concerning proof of fraud under § 6653(b). They do not in any way support appellants' argument.

### III.

Appellants claim that the Tax Court erred in holding that they could not use § 453 and § 1038 to shift much of the gain on the January 1979 sale of Brittany from tax year 1979 to tax year 1980. During the tax years in question, § 453(b) allowed a person who sold real property through an installment sale to elect to report income from the sale pursuant to the installment method.[15] Under § 1038, a taxpayer under some circumstances might postpone the recognition of gain or loss on the sale of property if the property had been reacquired by the taxpayer.

Appellants assert that, if they were permitted under § 453(b) to elect to report the gain on the January 1979 sale pursuant to the installment method, they could use § 1038 to split the reporting of the gain on the sale between tax years 1979 and 1980.[16] If applicable, § 1038 would have permitted appellants to report as gain from the sale on their 1979 return only a portion of the $172,300 in cash received by Scallen prior to his reacquisition of Brittany. The reporting of the remainder of the net gain on the sale ($463,652) would have been deferred until tax year 1980 when Scallen resold Brittany. The Tax Court rejected appellants' contention. It held that neither section applied to the facts of the instant case.

As for § 453(b), the Tax Court held that when appellants reported on their 1979 tax return only the $172,300 in cash received from the January 1979 sale in the mistaken belief that it was the only part of the gain that they were then required to report, they made a "binding election" of a reporting method as set forth in *Pacific Nat'l Co. v. Welch*, 304 U.S. 191 (1938). As such, they could not elect later to report the gain from the sale pursuant to the installment method.

In *Welch*, the Court held that, once a taxpayer had elected on his tax return for the year of sale a permissible method of reporting the income from the sale other than the installment method, he was barred from later electing to report the income pursuant to the installment method. *Welch, supra*, 304 U.S. at 194–95. The Tax Court in the instant case held that all that *Welch* and its progeny required to bind a taxpayer's election of a reporting method was that the taxpayer in some manner report the gain from the sale. Appellants reported part of the gain as "gain on reacquisition of real estate sold 2–1–79[,] reacquired 12–1–79" on Schedule D of their 1979 tax return.[17] The Tax Court held that this was sufficient to constitute a binding election under *Welch*.

We believe that the Tax Court was mistaken in its holding in this respect and that appellants did not make a binding election that barred them from electing to report the net gain on the January 1979 sale pursuant to the installment method. The key is not that appellants reported *some* of the gain from the January 1979 sale on their 1979 tax return, but rather that they chose an *impermissible* method to do so. The binding election rule of *Welch* does not preclude a taxpayer who has chosen an impermissible method of reporting a gain from the sale of real property from later choosing to report the gain pursuant to the installment method if the Commissioner

---

**15.** Under the installment method, the gain from an installment sale is reported and taxed over the life of the contract payments. During tax year 1979, a taxpayer was required affirmatively to report gain under the installment method. Section 453 was amended extensively by the Installment Sales Revision Act of 1980, Pub.L. No. 96–471, § 2, 94 Stat. 2247. Now most installment sales must be reported pursuant to this method.

**16.** Treas.Reg. § 1.453–5(b) (as amended in 1967) provides that the effect of a default by the buyer and subsequent repossession of real prop-

erty sold in a transaction reported under the installment method is governed by § 1038 and Treas.Regs. §§ 1.1038–1 through 1.1038–3 (as amended in 1967).

**17.** Appellants' original theory was that reacquisition of Brittany nullified the sale, resulting in appellants having to report only the cash received. This theory has some support, *Laurens Trust Co. v. Commissioner*, 3 B.T.A. 331, 332 (1926), *acq.*, V–1 C.B. 4; Rev.Rul. 80–58, 1980–1 C.B. 181, but appellants do not challenge the Tax Court's rejection of it.

disallows the impermissible method of reporting the gain. *Mamula v. Commissioner,* 346 F.2d 1016, 1018–19 (9th Cir. 1965); *Gibson v. Commissioner,* 89 T.C. 1177, 1186 (1987); *Wierschem v. Commissioner,* 82 T.C. 718, 723 (1984); *Reaver v. Commissioner,* 42 T.C. 72, 81 (1964). Accordingly, since appellants chose an impermissible method of reporting the gain from the January 1979 sale, they might have elected to report the gain pursuant to the installment method.

■ Unfortunately for them, however, to have elected the installment method would have resulted in no benefit to appellants, since we affirm the Tax Court's holding that § 1038 is not applicable to the facts of the instant case. Appellants cannot use § 1038 to shift most of the gain on the sale from tax year 1979 to tax year 1980. A seller of real property who reacquires it may not postpone realization of the gain under § 1038 when (1) on reacquisition the seller pays consideration to the purchaser in addition to discharging the purchaser's indebtedness on the sale; (2) both reacquisition of the property and payment of the additional consideration upon reacquisition were not provided for in the original contract of sale; and (3) the purchaser has not defaulted under the original sale contract nor is his default imminent. Treas.Reg. § 1.1038–1(a)(3)(i) (as amended in 1967).

The contract for deed in effect between Scallen and Herman when Scallen reacquired Brittany did not provide for Scallen's reacquisition of the property nor for the transfer of additional property to Herman should Scallen reacquire Brittany. Nevertheless, when Scallen reacquired Brittany he transferred three parcels of real property to Herman in addition to discharging Herman's indebtedness. Accordingly, under Treas.Reg. § 1038–1(a)(3)(i), appellants were permitted to use § 1038 only if Herman was in default under the contract or his default was imminent.

Although there was some evidence that Herman was in financial difficulty, the Tax Court found that he was neither in default nor was his default imminent. There is substantial evidence to support this finding. It is not clearly erroneous for the following reasons. First, Scallen admitted that he received $133,000 in cash from Herman on his reacquisition of Brittany. Second, on reacquisition Scallen transferred to Herman properties with a total equity of $311,000, even though he admitted that he had remedies available on default which he did not use. Third, even after paying Scallen $133,000 in cash, Herman agreed to make all contract payments through December 1979 and to incur further substantial maintenance expenses on Brittany. These facts support a reasonable inference that Herman was not in default, nor was he facing imminent default.

The only evidence that Herman was either in default or facing it was the testimony of Scallen that Herman was not making payments under the contract and the testimony of Hansen that Herman had "some personal problems which [sic] he was probably going to lose the property". This evidence was part of the trial testimony, much of it self-serving. It ordinarily is the exclusive duty of the Tax Court to consider the reliability of such evidence and to give it the weight it deserves. § 7482(a)(1) (Tax Court decisions reviewed in same manner as decisions in civil actions tried in a district court without a jury); *Commissioner v. Riss,* 374 F.2d 161, 166 (8th Cir.1967) (same); Fed.R.Civ.P. 52(a) ("due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses"). Accordingly, we believe that the Tax Court's determination that Herman was neither in default nor about to reach it was supported by substantial evidence on the record as a whole and is not clearly erroneous. We agree with the Tax Court's holding that § 1038 was not available to appellants.

We hold that, although appellants might have elected to report the January 1979 sale pursuant to the installment method, they were precluded from using § 1038 to shift much of the gain on the sale from tax year 1979 to tax year 1980.

## IV.

■ Appellants challenge the Tax Court's holding that Interfund was a collapsible corporation under § 341. This resulted in the Tax Court's treating as ordinary income the gain realized by Scallen on the transfer of the four condominium units back to Campus Realty. The Commissioner asserts that, since Scallen failed in the Tax Court to challenge the characterization of the gain as ordinary income, he may not do so now. We agree and do not reach the question of whether the Tax Court correctly treated Interfund as a collapsible corporation.

"It is a well established rule that issues not raised in the trial court cannot be considered by this Court as a basis for reversal". *United States v. Rodriguez*, 812 F.2d 414, 417 (8th Cir.1987); *Edwards v. Hurtel*, 724 F.2d 689, 690 (8th Cir.1984) (per curiam); *Morrow v. Greyhound Lines, Inc.*, 541 F.2d 713, 724 (8th Cir.1976). The purpose of this rule is to enforce the policy that requires litigants to inform the trial court promptly of any possible errors that it may have made so that it may have an opportunity to correct them. *Hurtel, supra,* 724 F.2d at 690; *Morrow, supra,* 541 F.2d at 724. This rule will be followed in our Court unless adherence to it would result in "a plain miscarriage of justice". *Id.* (quoting *Hormel v. Helvering*, 312 U.S. 552, 558 (1941)).

At trial in the Tax Court, the parties disputed the characterization of the transfer of the four condominiums. Appellants asserted that the transfer was neither a sale nor a distribution of capital—essentially that it was not a taxable transaction at all. The Commissioner asserted that the transfer was a distribution of Interfund's capital, an assertion that the Tax Court eventually accepted. In his posttrial brief, the Commissioner asserted that the distribution of capital was taxable as ordinary income because Interfund was a collapsible corporation. Appellants responded in their brief by asserting that the transfer was a sale, but they did not challenge the characterization of the gain on the transfer as ordinary income.[18] Appellants did not request the Tax Court to reconsider its ruling that Interfund was a collapsible corporation in their motion for reconsideration filed pursuant to Tax Court Rule 161.

We believe that appellants had ample opportunity to call to the attention of the Tax Court any error on this issue that appellants thought that the Tax Court may have made. Since appellants did not dispute the characterization of Interfund as a collapsible corporation, we hold that they may not now raise the issue on appeal. Our holding in this respect is consistent with the policy of requiring litigants to first request the trial court to correct any errors they believe may have been made before asking our Court to do so. *Hurtel, supra,* 724 F.2d at 690; *Morrow, supra,* 541 F.2d at 724. The instant case is not one in which our refusal to reach the issue on the merits will constitute a "plain miscarriage of justice". *Id.*

## V.

■ This brings us to appellants' claim that the Tax Court abused its discretion in denying their posttrial motion to amend their petition to elect income averaging pursuant to §§ 1301–1304 for the tax years 1977, 1979 and 1981. The Tax Court held that the motion was untimely, that to grant it would be prejudicial to the Commissioner, and that income averaging could not be calculated properly on the present record. We hold that the Tax Court did not abuse its discretion in denying the motion.

Appellants assert that the motion was not untimely. The motion was filed March 28, 1988, twenty-one months after trial and seven months after the August 24 decision informed appellants how all of the various issues would be resolved. Appellants assert, however, that the timeliness of their

18. In its August 24, 1987 opinion, the Tax Court stated: "[The Commissioner] maintains that the character of the gain would be ordinary because Interfund ... was a collapsible corporation under section 341(a). Petitioner *does not dispute this characterization,* and we agree with [the Commissioner's] analysis". 54 T.C.M. (CCH) at 201 (emphasis added).

petition should be determined as of March 16, 1988, the date on which the Commissioner filed his computation for entry of decision under Tax Court Rule 155.

At the very least, appellants waited nearly seven months after the August 24 decision was filed before filing their motion to amend. An analysis of the August 24 decision undertaken by appellants shortly after it was filed would have indicated whether income averaging was advantageous or not. We cannot say upon these facts that the Tax Court abused its discretion in holding that the motion was untimely.[19]

Moreover, the Tax Court did not abuse its discretion in holding that the Commissioner would be prejudiced by the granting of the motion and that income averaging could not be calculated properly on the present record. To calculate properly appellants' income for income averaging purposes, knowledge would be required of appellants' correct income during the base years 1973 through 1981. The burden of proving this correct income was on appellants. Tax Court Rule 142(a). As the Commissioner states, however, appellants failed to produce much of the documentation and records that would be necessary for them to establish the correct income for the base years. The Tax Court observed that the Commissioner failed to pursue certain claims relating to appellants' income for the base years because they were outside the relevant issues as then framed by the pleadings. If the Commissioner had known that appellants would assert the claim of income averaging, he might have contested it.

All things considered, we hold that the Tax Court did not abuse its discretion in denying appellants' motion to amend their petition to elect income averaging.

## VI.

To summarize:

We hold that there was substantial evidence to support the Tax Court's finding that in each of the tax years in which deficiencies were determined there was an underpayment of tax due to fraud. We therefore affirm the imposition of the 50% civil fraud penalty in each of the tax years in which a deficiency was determined.

We also hold that, although appellants might have elected to report the gain on the January 1979 sale of Brittany pursuant to the installment method, they cannot use § 1038 to shift much of the gain from tax year 1979 to tax year 1980.

We further hold that, since appellants failed to challenge the treatment as ordinary income of the distribution of capital from Interfund, they cannot now raise the issue on appeal.

Finally, we hold that the Tax Court did not abuse its discretion in denying appellants' motion to amend their petition to elect income averaging for the tax years 1977, 1979 and 1980.

Affirmed.

**19.** Appellants cite several cases which they claim show that the motion was not untimely. In not one of these cases, however, was income averaging requested as late in the Tax Court proceedings as here. In the cases cited the requests to average income were made in the taxpayers' briefs following trial, not, as in the instant case, after entry of the Tax Court's decision and the filing of the Commissioner's subsequent proposed computation of the taxpayers' tax liability. *See Mannette v. Commissioner,* 69 T.C. 990 (1978); *Criscuolo v. Commissioner,* 37 T.C.M. (CCH) 1449 (1978).