Alan A. **BRISTER,** Plaintiff,

v.

The **UNITED STATES,** Defendant.

No. 95–25T.

United States Court of Federal Claims.

March 25, 1996.

Alan A. Brister, plaintiff, pro se.

Benjamin King, Tax Division, United States Department of Justice, with whom were, Loretta C. Argrett, Assistant Attorney General, Mildred L. Seidman, Chief, Court of Federal Claims Section, and David Gustafson, Assistant Chief, Court of Federal Claims Section, Washington, DC, for defendant.

## OPINION

BRUGGINK, Judge.

This is an action for a refund of taxes. Jurisdiction is founded on the Tucker Act, 28 U.S.C. § 1491(a)(1) (1994). Plaintiff seeks to recover monies withheld by the United States, acting through the Internal Revenue Service ("IRS"). On March 22, 1993, the IRS adjusted plaintiff's tax returns for the tax years 1985 and 1986 reducing the amount of withholding credits in order to collect amounts improperly refunded to the plaintiff for those years. These adjustments caused plaintiff's tax liabilities for 1985 and 1986 to increase.[1] The IRS applied amounts that plaintiff otherwise would have received as refunds for tax years 1989 through 1992 as credits against these liabilities.

The Government concedes that the adjustments in 1993 were made more than three years after the returns were filed on January 26, 1986, and January 27, 1987, respectively, and therefore, were untimely under 26 U.S.C. § 6501(a) (1988).[2] It contends, however, that the time limitation is waived under § 6501(c)(1), which permits taxes to be assessed without time limit if a taxpayer files a "false or fraudulent return with the intent to evade tax." If the Government is unable to prove the returns were false or fraudulent and that they were filed with an intent to evade tax, then the 1985 and 1986 returns remain valid and plaintiff would be entitled to a return of the monies the IRS withheld from plaintiff's refunds for the tax years 1989 through 1992. After trial, the court finds, for the reasons set out below, that the 1985 and 1986 returns were false and were filed with an intent to evade tax and, therefore, the Government has established a defense to plaintiff's claim.

## BACKGROUND

The dispute at issue arises out of refunds claimed by Brister for tax years 1985 and 1986.[3] His returns for those years asserted that he was entitled to a return of overpayments of federal income tax withholdings. He claimed, and was refunded, $10,435.50 and $5,231.42 for alleged 1985 and 1986 withholdings, respectively.[4] The court uses the term "alleged" advisedly. Both returns were accompanied by W–2 forms, prepared by Brister, showing that his employer, Solar Roofing, Inc. ("Solar Roofing"), had paid those amounts on Brister's behalf. It is undisputed that those amounts were never paid and that the refunds were, at best, erroneous. In fact, the evidence shows that the W–2 forms were false, and that Brister knew they were false.

Relevant events begin in 1978 with the formation of Solar Roofing. The company

---

1. The adjustment led to unpaid tax liabilities of $10,435.50 for 1985 and $5,231.42 for 1986.

2. Section 6501(a) states, "[e]xcept as otherwise provided in this section, the amount of any tax imposed by this title shall be assessed within 3 years after the return was filed...." All subsequent citations are to Title 26 of the United States Code and refer to the Internal Revenue Code sections that were applicable during the relevant times.

3. Plaintiff's 1985 and 1986 tax returns were joint tax returns, filed in the names of Gertrud and Alan Brister. The present suit is brought in the name of Alan Brister only.

4. The actual withholding amounts claimed for 1985 and 1986 were $20,367.42 and $14,970.86, respectively. The $10,435.50 and $5,231.42 represent the withholding amounts attributable to Solar Roofing, Inc. that are at issue in this case.

was a small, family-held roofing business, organized by Wes and Ann Corle in Charlotte, North Carolina. Wes Corle served as the company president and Ann Corle served as the secretary and treasurer. Shortly after the company was established, the Corles invited their friend, the plaintiff, to serve as the company accountant. Brister had just completed a degree in accounting and passed all four parts of the Certified Public Accountant exam.

Brister was an incorporator of the company and for a time owned stock. Shortly after its formation, however, Brister turned in his stock because he wanted no part in the management of the firm. From that point on he was carried on Solar Roofing's books as an employee.

As its accountant and bookkeeper, Brister prepared Solar Roofing's tax documents, including its W–2s, W–3s and Form 941s.[5] Until 1985, Brister did all his bookkeeping for Solar Roofing in Charlotte. In 1985, Brister moved to Tennessee, but maintained some control over Solar Roofing's books. Ann Corle, as secretary and treasurer of Solar Roofing, would periodically send financial documents to Brister in Tennessee so he could update Solar Roofing's books and prepare tax forms.

Solar Roofing was on shaky financial grounds from the outset. In its seven years of existence it posted a profit in only one year. In order to meet payroll and other expenses, the corporation borrowed money from plaintiff from time to time. Due to its financial problems, Solar Roofing was unable to repay all of Brister's loans. After numerous attempts to secure repayment, Brister suggested that the company "withhold" more for Brister's federal income tax than he actually earned and that the difference, assuming it was actually paid by the company to the IRS, would be collected by Brister in the form of a tax refund.[6] This excess amount would be treated as a partial repayment of the loans. Ann Corle agreed, and in 1984 Solar Roofing reported a withholding of $6,000 in federal income tax on $3,610 in wages. He prepared the Form 941 reporting that Solar Roofing withheld $6,000 in federal income tax from his wages. This Form 941 was submitted, along with payment to the IRS.[7] Brister also prepared the W–2 for his Solar Roofing wages. In early 1985, Brister prepared his Form 1040 for 1984 and filed it, along with the Solar Roofing Form W–2. The return sought, and Brister was paid, a refund of the excess amount.

Brister testified that he had checked with the IRS via a "1–800" number to determine the validity of his plan. He stated that an IRS employee, after consultation with a manager, told him that it would be lawful for him to overwithhold his federal income tax as long as:

1. His employer was filing a supporting copy of the W–2, showing the same data;

2. His employer was filing a Form W–3 whose totals included the amounts shown on his W–2;

3. His employer was filing a Form 941 which included the amounts shown on the Form W–2; and,

5. A Form W–2 is prepared by an employer for each employee. The W–2 lists the total amount of wages, tips and other compensation paid to the employee as well as the amounts of federal, state and social security tax withheld from this income. The W–2 is then mailed to the employee who attaches it to his or her personal income tax return.

A Form W–3 is created by each employer and submitted to the IRS giving the total amount of social security tax withheld. The W–3 is not given to the employee.

A Form 941 is created quarterly by each employer and describes the amount of federal income tax withheld from employees' income. The form must be submitted to the IRS along with payment of the amounts withheld from employees' paychecks. The Form 941 is not given to the employee.

6. Brister had been overwithholding state income tax amounts since 1981 but this excess withholding never exceeded the total amount of wages actually paid and was prompted by a legitimate state tax liability due to other income.

7. It is unclear why the Corles would agree to pay this lump sum to the Government as withholding tax rather than directly to Brister. It was suggested during trial that it was easier for Solar Roof to borrow additional money to pay taxes than it was to borrow money to pay off an unsecured loan.

4. His employer was sending a check with the Form 941 in full payment of the tax liability shown.

All of these conditions were met in 1984 and the Government has not challenged the return for that year.

Upon learning of Brister's plan, Wes Corle testified that he told Brister that he would not allow him to overwithhold again. Brister disputes Wes Corle's recollection of this conversation. Ann Corle however, testified that she knew her husband was not happy with the scheme, and the court finds Wes Corle's recollection more persuasive.

Sometime in early 1985, Brister and the Corles had a falling out. Both Brister and Wes Corle testified that the two of them could no longer have a conversation without it turning into a heated argument. It was about this time that Brister moved to Tennessee.

Things took a turn for the worse for Solar Roofing in the third quarter of 1985. Despite the fact that Solar Roofing was winning more and more bids, it had trouble obtaining sufficient funds. The Corles testified that several general contractors demanded kickbacks before they would award Solar Roofing subcontracts. The Corles refused to pay these kickbacks and were "black-balled" by the general contractors. Solar Roofing was unable to collect monies owed to it by suppliers and was forced to go out of business in November of 1985.[8]

Brister continued to have difficulty obtaining repayment from Solar Roofing. On January 27, 1986, he sent the Corles a letter outlining his plan to submit a 1985 W–2 indicating $3,180 in wages and $10,435.50 in withheld federal income tax. $10,435.50 was the amount Brister calculated that Solar Roofing owed him for salary, expenses, and the interest and principal amounts of several loans. The Corles never responded to this letter. He sent a handwritten copy of his 1985 W–2 to Ann Corle who typed it and submitted it to the IRS on Solar Roofing's behalf. Brister filed his W–2 along with his 1985 tax return and received a refund in the amount of $13,725.42, which included the $10,435.50 reported as withheld by Solar Roofing.

When Ann Corle and Brister finally spoke about the 1985 W–2 withholding, Ann Corle stated she would figure a way to pay the amount of withholding. It is unclear whether this conversation took place in late January 1986 or sometime in March of 1986. In any event, it was after Brister had filed his return for 1985. Brister testified that he told Ann Corle to notify him if she did not pay the withholding taxes. Ann Corle could not recall this part of the conversation. Wes Corle was not consulted or notified of Brister's overwithholding even though he was president of the corporation.

A Form 941 reflecting the amount of Brister's withholding was prepared in early 1986, but was never submitted along with payment to the IRS. Ann Corle testified that the form was never submitted because Solar Roofing did not have enough money to pay the taxes.

In March, 1986, Brister went to Charlotte. There is conflicting testimony as to whether he did work for Solar Roofing during that visit. Although, it is unclear whether Brister knew that Solar Roofing was out of business when he submitted his 1985 income tax return, there is no question that by the time of this visit Brister knew that Solar Roofing was no longer in business. Also during this trip, Brister spoke to Wes Corle and asked if Solar Roofing's income taxes would be paid. Not knowing about Brister's overwithholding, Wes Corle answered that, yes, he thought Solar Roofing would pay all the income taxes since it did not owe more than $10,000. As Brister must have known, Wes Corle could not have been promising to pay the withholding for Brister, since Brister's claim alone was more than that figure. This is borne out in a letter Brister sent to Wes Corle in May of 1986. Brister wrote, "You can see why I knew that you had no idea what you were talking about, when you told me that Solar's total tax obligation of the fourth quarter of [19]85 was under $10,-000.00—mine alone was in excess of $10,-600.00, not counting the federal and state

8.  Solar Roof never went into bankruptcy.

unemployment taxes." In the same letter, Brister threatened to do the same thing for the 1986 tax year: "unless I hear from you and receive some payment on your obligations, I shall file a W–2 form for 1986, showing [$80.00 in wages and $5,231.42 in federal income tax withholding]." These amounts represented what Brister believed was still owed to him by Solar Roofing. The Corles never responded to this letter.

In July, 1986, Karl Mace, an IRS Revenue Officer in the Charlotte Field Office, contacted Ann Corle to discuss the missing fourth quarter Form 941. In response to Mace's question of why she had not filed the form, Ann Corle responded that Solar Roofing could not pay the taxes indicated. Mace then asked to see the draft form. Mace testified that when Ann Corle gave him the form she stated that she was not sure if it was correct and pointed to the amount reportedly withheld by Brister. Mace then asked to see Solar Roofing's payroll records. Using the figures contained in those records, Mace drafted a new Form 941 which excluded all amounts of withholding reported by Brister. Ann Corle reviewed and signed the document and it was filed along with a request for installment payments. Ann Corle told Mace that Brister should be notified of this change so that he could make the appropriate changes to his 1985 return. Believing Brister's overwithholding to be fraudulent, Mace counselled Ann Corle to say nothing about the change to Brister; that he would "take care of it."

Sometime after November 29, 1986, Mace notified the IRS criminal investigation division of Brister's overwithholding. The criminal division began an investigation and appointed Special Agent Gary Sinclair to head the investigation.

In October of 1986, Brister returned to Charlotte to attend a funeral. While in Charlotte, Brister spoke to Ann Corle for several minutes. No mention was made about either the 1985 withholding taxes or Brister's intent to claim withholding taxes in

1986. Brister also spoke to Wes Corle during this trip. He did not ask whether the company had paid the 1985 taxes.

On January 27, 1987, Brister filed his 1986 personal income tax return and included $5,231.42 in federal income tax withholding on $80.00 in wages.[9] Brister testified that after his May 1, 1986, letter to the Corles, he never notified the Corles of his intent to report this withholding. Nor did he contact the Corles to inquire about payment of the 1985 taxes.

After an internal investigation, Special Agent Sinclair visited Brister on December 27, 1989, at his home in Clarksville, Tennessee. After advising Brister of his Fifth Amendment rights, Sinclair questioned him about the 1985 and 1986 tax years. Brister told Sinclair of his association with the Corles and Solar Roofing and gave all the details regarding the overwithholding. He admitted telling the Corles, "If you are not going to pay me any other way, then I am going to set things up so that you will have to pay the IRS." He stated that by reporting the overwithholding, Solar Roofing would be forced to pay the IRS for the loans he had made to Solar Roofing. Brister also admitted that when Ann Corle stated they (the Corles) did not have the money to pay the IRS, he replied, "It's not my problem."

In 1990, Brister prepared Form 1040Xs for tax years 1985 and 1986. The amended returns removed the Solar Roofing withholding and treated the Solar Roofing loans as bad debts. They reflected that Brister owed $9,063.50 for 1985 and $3,543.42 for 1986. Brister and his wife signed the amended returns on August 3, 1990. Brister then contacted Neal Bateman, his attorney, regarding these returns. Bateman advised him not to mail the returns, saying they would "muddy the waters." Based on this advice, Brister chose not to file the returns immediately. He waited until September 1, 1991, to do so but did not accompany the return with the amounts owed.[10]

9. It is unclear if Brister actually earned the $80.00 in wages in 1986. There was testimony that he may have worked on some Solar Roof documents in March of 1986.

10. Gloria Patton, an IRS employee, told Brister that the 1040X was invalid because it cannot be filed more than 2 years after the closing date. Brister acknowledged he owed the IRS the

Based on the investigation and subsequent interview, Special Agent Sinclair referred the matter to the U.S. Attorney's office for prosecution. Brister was indicted on two counts of felony tax evasion in violation of § 7206(1) for willfully filing false tax documents. The trial was held July 23 through July 25, 1991, the jury deadlocked and the judge declared a mistrial. Nine jurors voted to convict and three to acquit. The Government chose not to re-try Brister.

In March, 1993, the IRS reversed Brister's 1985 and 1986 withholding credits with respect to Solar Roofing. It adjusted his tax liabilities upward for 1985 and 1986 by the amounts of the disallowed withholding. This resulted in an underpayment of $10,435.50 for 1985 and $5,231.42 for 1986. To collect those amounts, the IRS applied against them overpayments for tax years 1989 through 1992 pursuant to § 6402(a).

On December 19, 1993, Brister filed suit in this court seeking a refund for tax years 1989 through 1992. This court dismissed that complaint for lack of jurisdiction because plaintiff's real complaint was with the IRS's treatment of tax years 1985 and 1986, for which he had not filed a new refund request. *See Brister v. United States,* No. 93–714T (Fed.Cl. Dec. 22, 1994). The timeliness of the 1985 and 1986 amendments was not addressed in the earlier opinion. This suit followed. Brister claims that the IRS' reversal in 1993 of the refunds arising out of the 1985 and 1986 tax years was untimely and that he is, therefore, entitled to a return of those monies.

### DISCUSSION

Brister does not contend that the IRS' actions would have been improper if undertaken timely. Instead, he correctly points out that the Government is presumptively barred from adjusting his 1985 and 1986 tax returns in 1993 because of the three year limitations period against assessments contained in § 6501. For the Government's action to be timely, it must meet one of the

exceptions to this limitation. As support for its ability to do so, the Government cites § 6501(c)(1), which states:

> In the case of a false or fraudulent return with the intent to evade tax, the tax may be assessed, or a proceeding in court for collection of such tax may be begun without assessment, at any time.

Specifically, the Government alleges that Brister knew that Solar Roofing could not and would not pay the 1985 and 1986 withholding tax. The Government concludes, therefore, that by filing a W–2 with knowledge that the excess amounts had not been nor would be paid, Brister filed a false or fraudulent return with the intent to evade tax.

The Government bears the burden of proof to establish its defense, and must do so through clear and convincing evidence. The defense consists of two parts. First, defendant must prove that the 1985 and 1986 returns were false or fraudulent. The court has been unable to find any cases discussing whether the terms "false" and "fraudulent" in this section are meaningfully distinct. The court notes that "fraud" under § 6501 can be found if there is an intent to cheat or deceive the Government. *See Mitchell v. Comm'r,* 118 F.2d 308 (5th Cir.1941). Although there are apparently no decisions construing the term "false" under this section, cases construing that same term used in § 7205[11] hold that a statement is false if it was untrue when made, and was known to be untrue by the person making it. *United States v. Hinderman,* 528 F.2d 100, 102 (8th Cir.1976). *See United States v. Hudler,* 605 F.2d 488 (10th Cir.1979). For reasons set out below, the court is satisfied that defendant has established that the returns were knowingly false. It is unnecessary, therefore, to consider whether the terms are synonymous. In any event, falsehood in this context requires proof of more than mere error or negligence.

amount of overwithholding previously refunded but stated he never paid it back because he never got any response from the IRS.

11. Section 7205 imposes criminal penalties on employees who willfully supply false or fraudulent information to an employer regarding an employee's wage withholding.

### I. *Were the Returns False?*

#### A. The 1985 Tax Year

■ Brister argues that there is no legal prohibition against withholding more than he earned, and points to his conversation with the IRS representative in 1984 as evidence of his bona fides. While there may be no technical violation in overwithholding, there is a deceit if the monies are not actually paid into the Treasury, and the "taxpayer" knowingly then recoups the overwithholding. Brister's defense that he consulted with the IRS is specious. According to Brister, prior to filing his W–2, he was told that he had to ensure that his employer was filing, along with payment, a Form 941 reflecting the amount of withholding. But in fact, when Brister filed his 1985 tax return reporting an overwithholding of federal income tax of $10,435.50, he did so without specific permission from his employer, Solar Roofing, or its principal officers, Wes and Ann Corle. Wes Corle testified that after he learned of Brister's 1984 overwithholding, he told Brister that he would not allow Brister to do it again. This put Brister on notice that the corporation would not cooperate in his scheme and pay overwithholdings.

Brister testified that when he spoke with the Corles in March 1986, he asked Ann Corle if the fourth quarter 1985 Form 941 had been filed. She replied that it had not because she did not have the money to accompany it with payment. There was further testimony that Brister told Ann Corle that the Form 941 had to be filed and the tax paid or his tax return would be in error. Ann Corle answered that she would attempt to find a way to pay the tax. When Brister asked Wes Corle if the taxes were going to be paid, Wes Corle responded he thought they would because they owed less than $10,000. This put Brister on notice that his withholding tax was not going to be paid by Solar Roofing. These circumstances demonstrate that at the time he filed the return, Brister knew the taxes had not been paid. Nor did he do anything else to ensure that the Form 941 was filed for 1985 and the missing withholding amounts paid. As he told Ann Corle, he did not consider that his problem. Brister admitted that he told the Corles he would use his scheme to ensure that he was paid, leaving the IRS to collect its money from the Corles.

Plaintiff's scheme thus involved more than mere overwithholding. His real intent, as he told Sinclair, was to use the IRS as a collection agency. By collecting a refund for nonexistent overwithholding, he attempted to extinguish Solar Roofing's obligation to him and thus transfer to the IRS the task of collecting his personal debts from the corporation.

Brister is trained as an accountant. He had experience preparing the relevant tax forms. He had been informed by the IRS of the narrow circumstances under which overwithholding was permitted. He had every reason to know he had not satisfied them for the 1985 tax year. The court finds that at the time of filing, Brister's tax return reflected withholding credits to which he knew he was not entitled. The return was false and he knew it to be false.

#### B. The 1986 Tax Year

In his May 1, 1986 letter, Brister informed the Corles of his intent to recoup the balance of the amount Solar Roofing owed him by overwithholding $5,231.42. The Corles never acknowledged the receipt of this letter. Brister, therefore, had no reason to believe that the amount had been paid and every reason to think it had not. Brister testified that he sent a letter to the Corles later that year that included a form for the Corles to sign and return that would authorize his overwithholding. The Corles could not recall receiving this letter and it was not offered at trial. In any event, Brister testified that he received no response to the letter. He further testified that he made no other efforts to contact the Corles to get their authorization for the 1986 withholding. Nor did he make any effort to ensure that a corresponding Form 941 was filed along with payment with the IRS. It is clear that Brister's 1986 tax return with the 1986 W–2 claiming withholding of $5,231.42 was made in the face of certain knowledge that he was asking for monies never sent to the Treasury. As such the court holds that the 1986 return was false as well.

## II. Was there an "intent to evade tax"?

The circumstances here are different from those in other cases applying § 6501(c)(1) in that in the present case, eliminating the non-existent withholdings from the 1985 and 1986 returns would not have caused Brister to pay additional income tax in those years. In both those years, Brister had sufficient legitimate withholdings to offset his tax liability. He would, therefore, have been entitled to a refund even if the illegitimate withholdings had never been claimed. Brister's actions resulted, not in a lower tax payment, but in a larger refund.

It is perhaps only serendipitous that the additional withholdings were not necessary to offset the amount of tax owed. If the amounts Brister had withheld in connection with his taxable pension distributions for 1985 and 1986 had been insufficient to offset his tax liability for those years, the improper withholdings would have resulted in a dollar for dollar payment toward that liability. In that event, there would be no question that the circumstances were within the literal reach of the statute. Because of the apparently unique circumstances here, however, at the conclusion of trial the court sua sponte raised the question of whether § 6501(c)(1) is applicable when the alleged falsehood generates a benefit to the taxpayer other than a reduction in tax.

The court has not been cited to any cases addressing the question of whether the tolling provision applies when the taxpayer's [12] tax liability is not directly affected by a deception, nor has it located any itself. Most nearly on point is *Scallen v. Commissioner*, 877 F.2d 1364 (8th Cir.1989). That case involved § 6653(b),[13] which permits the imposition of a civil penalty for fraudulent "underpayment" of taxes. The taxpayer there made the argument that his fraud in generating some of the net operating loss deductions he had claimed was irrelevant because he could claim sufficient legitimate deductions so that tax would not have been owed in any event. The court rejected the factual premise behind that argument, but it went on to state:

> [A]ppellants' reading of the statute is inconsistent with the policies behind the statute, namely, to protect the revenue and compensate the government for the costs of investigating the appellants' fraud and for other losses caused by the fraud. The statute clearly is designed to deter taxpayers from defrauding the Commissioner. We do not believe that it would be consistent with these policies or with the language of the statute to permit Scallen to commit fraud in his tax returns and then to allow him to escape liability for the fraud through the fortuitous circumstance that less than half of the erroneously claimed [net operating losses] were attributable to fraud items. That would neither protect the revenue nor compensate the government for the costs of Scallen's fraud.

877 F.2d at 1372 (citations omitted).

The circumstances that lead the *Scallen* court to apply § 6653(b) are applicable here as well. Brister's actions affected the "credit" half of the debit and credit elements used by the IRS in calculating a taxpayer's net tax liability. Although, at least until the refund and its subsequent reversal, the amount of the debits and credits was such that there was no net tax liability, that was merely fortuitous. The calculus itself was tainted by the improper withholdings. Regardless of whether the taxpayer or the IRS owes the opposite party, there can be only two sides to the ledger column, those items that constitute credits toward satisfying a tax liability, and those that add to the tax liability. The reconciliation of those figures yields a single net figure. After the withholding credits in this case were properly reversed, Brister was put into the position of owing money to the IRS. Brister's actions, while not allowing

---

**12.** *DeRochemont v. United States,* 23 Cl.Ct. 80, 84 n. 6 (1991), held that the IRS erred in assessing additional taxes against plaintiff in an effort to recoup an improper refund because he was not the taxpayer to whom the refund was issued. DeRochemont had fraudulently induced the IRS to pay a third party. As the Government points out, this factually distinguishes the case from the present circumstances.

**13.** That provision has since been given a new section number, § 6663. Pub.L. 101–239, Title VII, § 7721(a), Dec. 19, 1989, 103 Stat. 2397.

him to actually evade tax, fall squarely within the reasoning of *Scallen* and it would be inconsistent with the purpose and language of § 6501(c)(1) to allow Brister "to escape liability for the fraud through ... fortuitous circumstance[s]. ..." 877 F.2d at 1372. Therefore, the court holds that Brister's actions demonstrate an intent to evade tax. The court is persuaded that the monies Brister obtained as the result of filing a false return constituted a tax liability and hence the "debt" thus created is within the reach of the tolling provision. The Government can utilize the tolling provision in § 6501(c)(1).

It follows, therefore, that the IRS' 1993 adjustment reversing the 1985 and 1986 refund credits and treating them as a tax liabilities was not untimely. Brister has not otherwise challenged the Service's right to make the assessment, and it was, accordingly, proper.

## CONCLUSION

The defendant has proven by clear and convincing evidence that plaintiff's tax returns for 1985 and 1986 were false, and that he filed them with an intent to deceive the Government. The clerk is directed to enter judgment for the defendant. Costs to defendant.