ROBERT S. GRUBER AND SANDRA GRUBER, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Gruber v. Commissioner
Docket Nos. 4811-93, 4812-93, 4813-93, 4814-93, 4815-93
United States Tax Court
T.C. Memo 1995-230; 1995 Tax Ct. Memo LEXIS 233; 69 T.C.M. (CCH) 2718; May 25, 1995, Filed *233 Decision will be entered under Rule 155. For petitioners: John Kennedy Lynch and Joseph F. Timmons
For respondent: Marc A. Shapiro COLVIN
COLVIN
MEMORANDUM FINDINGS OF FACT AND OPINION COLVIN, Judge: Respondent determined that petitioners are liable for deficiencies in Federal income taxes and additions to tax and penalties as follows: Docket No. 4811-93, Robert S. Gruber and Sandra Gruber Additions to Tax
Sec.
Sec.
Sec.
Year
Deficiency
6653(a)(1)
6653(b)(1)
6661
1988
$ 14,897
$ 104.85
[1] $ 9,600
$ 3,724
1989
11,996
-- -- -- Penalties
Sec.
Sec.
Year
6662(a)
6663(a)
1988
-- --  1989
--
[1] $ 8,997
Docket No. 4812-93, Efstratios Zoumberakis & Angie Zoumberakis Additions to Tax
Sec.
Sec.
Sec.
Year
Deficiency
6653(a)(1)
6653(b)(1)
6661
1988
$ 15,729
$ 123.60
[2] $ 9,942.75
$ 3,932.25
1989
22,189
-- -- -- Penalties
Sec.
Sec.
Year
6662(a)
6663(a)
1988
--  --   1989
$ 1,610.40
[2] $ 10,602.75
Docket No. 4813-93, Gregory Kalikas and Stephanie *234 Kalikas Additions to Tax
Sec.
Sec.
Sec.
Year
Deficiency
6653(a)(1)
6653(b)(1)
6661
1988
$ 14,898
$ 104.90
[3] $ 9,600
$ 3,724.50
1989
39,105
-- -- -- Penalties
Sec.
Sec.
Year
6662(a)
6663(a)
1988
--  --   1989
$ 5,422
[3] $ 8,996.25
Docket No. 4814-93, Ioannis Kallergis a.k.a. John I. Kallergis & Margi Kallergis
Additions to Tax
Sec.
Sec.
Sec.
Year
Deficiency
6653(a)(1)
6653(b)(1)
6661
1988
$ 14,897
$ 104.85
[4] $ 9,600
$ 3,724.25
1989
12,079
-- -- -- Penalties
Sec.
Sec.
Year
6662(a)
6663(a)
1988
-- --   1989
--
[4] $ 9,059.25
Docket No. 4815-93, Michael Politis & Maria Politis Additions to Tax
Sec.
Sec.
Sec.
Year
Deficiency
6653(a)(1)
6653(b)(1)
6661
1988
$ 14,898
$ 104.90
[5] $ 9,600
$ 3,724.50
1989
11,995
-- -- -- Penalties
Sec.
Sec.
Year
6662(a)
6663(a)
1988
-- --   1989
-- [5] $ 8,966.25
Following concessions, we must decide *235 the following issues: 1. Whether Quality Mold, Inc., an S corporation wholly owned by petitioner husbands, made business enhancement payments. We disallow deductions for business enhancement payments because we have no basis for deciding how much Quality Mold, Inc., paid during the years in issue. 2. Whether each petitioner husband is liable for the addition to tax for fraud under section 6653(b) for 1988 and the penalty for fraud under section 6663(a) for 1989. We hold that each is. 3. Whether petitioners are liable for the addition to tax for substantial understatement under section 6661(a) for 1988. We hold that they are. 4. Whether petitioners Efstratios and Angie Zoumberakis and Gregory and Stephanie Kalikas are liable for the accuracy-related penalties under section 6662(a) for 1989 for certain underpayments for which petitioner husbands are not liable for fraud. We hold that they are. Section references are to the Internal Revenue Code in effect during the years in issue. Rule references are to the Tax Court Rules of Practice and Procedure. FINDINGS OF FACT Some of the facts have been stipulated and are so found. A. Petitioners
Robert S. Gruber (Gruber) *236 and Sandra Gruber are married. Gruber lived in Akron, Ohio, and Sandra Gruber lived in Canton, Ohio, when they filed their petition. Gruber is an engineer. Efstratios Zoumberakis (Zoumberakis), also known as Steve Zoumberakis, and Angie Zoumberakis are married and lived in North Canton, Ohio, when they filed their petition. Gregory Kalikas (Kalikas) and Stephanie Kalikas are married and lived in North Canton, Ohio, when they filed their petition. Kalikas has an engineering degree. Ioannis Kallergis (Kallergis), also known as John Kallergis, and Margi Kallergis are married and lived in Akron, Ohio, when they filed their petition. Michael Politis (Politis) and Maria Politis are married and lived in Canton, Ohio, when they filed their petition. B. Quality Mold
1. Background
Quality Mold is a subchapter S corporation which is in the business of manufacturing and repairing tire molds. It manufactures and sells tire molds and related machinery for the tire industry in the United States and overseas. It began its operations in 1978 in Akron, Ohio. In 1980, it moved to a larger building. In 1986, it established a plant in Tyler, Texas. In 1987, it bought a facility *237 in Bradford, Ontario, Canada. Quality Mold's sales gradually increased from about $ 220,000 in 1978 to more than $ 10 million in 1989. Most of its growth before 1987 was from domestic sales. After 1987, most of its growth was from foreign sales. Quality Mold had competition in foreign markets from companies based in Taiwan, Japan, South Korea, Europe, and the United States. It was difficult for Quality Mold to enter foreign markets. Quality Mold first entered markets in Canada, then Mexico, England, Latin American countries other than Mexico, and then Middle Eastern countries and Japan, South Korea, Taiwan, the Philippines, India, and Malaysia. To help develop its foreign business, Quality Mold made some cash business enhancement payments (also called grease payments) to foreign individuals. [2]Quality Mold negotiated each business enhancement payment separately. It did not keep contemporaneous records of its business enhancement payments. *238 At the time of trial, Quality Mold employed about 90 people in Akron, Ohio, 30 in Tyler, Texas, 70 in Ontario, Canada, and about 100 in Greenwich, Ohio. Versitech Corp. (Versitech) and Greenwich Mold, Inc. (Greenwich), located in Greenwich, Ohio, were partly owned by petitioner husbands in 1988 and 1989. 2. Petitioner Husbands' Roles in Quality Mold
Each petitioner husband held 20 percent of Quality Mold's stock in 1988 and 1989. All of petitioner husbands except Gruber had been Quality Mold shareholders since it began to operate in 1978. Gruber became a Quality Mold shareholder in 1986. All of petitioner husbands were officers and managers of Quality Mold in 1988 and 1989. Each petitioner husband was highly involved in Quality Mold's daily operations in the years in issue. Zoumberakis was president and chief executive officer when he signed Quality Mold's Federal income tax returns for 1988, 1989, and 1990. He was responsible for scheduling production. Gruber was vice president of engineering in 1988 and 1989. He also made some sales. Also in 1988 and 1989, Kalikas was Quality Mold's vice president of sales, Politis was secretary, and Kallergis was treasurer and *239 vice president. Kalikas and Gruber made most of Quality Mold's foreign sales. Kallergis supervised the Akron shop in 1988 and 1989. Politis was foreman of the finishing department in 1988 and 1989. 3. Quality Mold's Scrap Metal Sales to Senser Metal Co., Inc.
Quality Mold began to sell scrap metal to Senser Metal Co., Inc. (Senser), in the late 1970's or early 1980's. Quality Mold sold $ 226,503 of scrap metal to Senser in 1988 and $ 214,206 in 1989. Zoumberakis represented Quality Mold in dealing with Senser from 1988 to 1990. Zoumberakis asked Senser to pay cash for the scrap metal. Senser paid $ 226,503 to Quality Mold in cash for scrap metal in 1988, $ 214,206 in 1989, and $ 90,392.29 in 1990. Senser always gave Quality Mold a receipt. Senser put Quality Mold's name on the receipts before February 22, 1989. Zoumberakis then asked Senser to refer to Quality Mold as "VHP" with regard to the cash payments for scrap. On some of Senser's receipts and records, Senser wrote VHP and Quality Mold. Senser sometimes used the name Quality Mold instead of VHP. Once Zoumberakis called Senser's bookkeeper, Edna Manion (Manion) and Senser's president, Saul Senser (Mr. Senser), *240 to complain about Senser's using the name Quality Mold instead of VHP. Quality Mold did not deposit the scrap income in its business accounts. It did not record the scrap income on its books and records. It first reported the scrap income on its amended Federal income tax returns which it filed after respondent issued the notices of deficiency. On its amended returns, Quality Mold reported income from "scrap proceeds" of $ 208,494 for 1988 and $ 195,540 for 1989, and deducted business enhancement payments of $ 218,000 for 1988 and $ 200,930 for 1989. [3] The scrap income was ordinary income to Quality Mold in 1988 and 1989. Each petitioner husband knew that Quality Mold sold scrap for cash and knew that Quality Mold did not record the sales in its books or report the scrap income on its Forms 1120S or Schedules K-1. Petitioners did not report any of the cash scrap income received by Quality Mold in the years in issue *241 on their original individual income tax returns. The scrap metal that Quality Mold sold to Senser came from the Quality Mold machine shop. Quality Mold delivered the scrap to Senser and Senser picked up scrap from Versitech and Greenwich in 1988, 1989, and 1990. Petitioners and Quality Mold did not keep Senser's receipts. Senser delivered the cash to Quality Mold in sealed envelopes. Senser gave the sealed envelope to Quality Mold's driver Belford Bowman (Bowman), and on occasion, to Kallergis and Kalikas. Bowman was the only driver who delivered scrap to Senser for Quality Mold in 1988, 1989, and 1990. Bowman usually gave the sealed envelope to Zoumberakis. Bowman sometimes gave the envelope to Politis and Kalikas. Senser bought scrap metal from sellers other than Quality Mold and paid about half of them by check and the rest in cash. The scrap metal sellers requested payment by cash or check, and Senser complied. Quality Mold was Senser's largest scrap metal seller who dealt in cash. 4. The Commissioner's Audit of Senser
The Commissioner audited Senser in June 1991. During the audit, Senser disclosed to the Commissioner that it bought scrap metal from Quality Mold. *242 After the audit, Zoumberakis called Senser to ask that Senser no longer refer to Quality Mold as VHP. After September 25, 1991, Senser paid by check to Quality Mold. C. Versitech Corp.
Versitech, an S corporation, was located in Greenwich, Ohio, in 1988 and 1989. During that time, the shareholders of Versitech were as follows: [4]
Percentage
Shareholder
Stockholding
Michael Politis
6.66
Ioannis Kallergis
6.66
Gregory Kalikas
6.66
Efstratios Zoumberakis
6.66
Robert Gruber
6.66
Mark Slanta
14.00
Walt Slanta
30.44
John Montgomery
22.22
Versitech merged into Quality Mold on January 1, 1990. After the merger, each Versitech shareholder owned 12.5 percent of Quality Mold's stock. Quality Mold, using the name Versitech, sold scrap metal to Senser for $ 39,389.46 in 1990. Senser put the name Versitech on the receipts for the scrap metal it bought from Versitech. Senser picked up the scrap which it bought *243 from Versitech. Quality Mold did not deliver any scrap metal for Versitech to Senser in 1988, 1989, or 1990. Kallergis handled the scrap sales to Senser for Versitech. He picked up Senser's payments for Versitech. Neither Quality Mold nor Versitech deposited the $ 39,389.46 in any business checking account, recorded it in any books or records, or reported it on any income tax return. Each petitioner husband knew this. Quality Mold, using the name Versitech, sold scrap metal for $ 35,293.53 to Harry Rock Co., Inc. (Harry Rock), in 1990. Harry Rock paid $ 17,837.90 in cash and $ 17,455.63 by check in 1990. When Harry Rock paid cash, it wrote a check to cash, cashed the check, and paid the cash to Versitech. Harry Rock's receipts showed that the checks made payable to cash were for payments to Versitech. When Harry Rock paid Versitech for scrap by check, it made the checks payable to Versitech. Versitech deposited the Harry Rock checks, but not the cash, in its payroll accounts. Versitech recorded the checks in its books but not the cash. Quality Mold reported the checks Harry Rock paid to Versitech on its 1990 Form 1120S, but not the cash. D. Greenwich Mold, Inc.
*244 Greenwich, an S corporation incorporated in 1990, sold scrap metal to Senser in 1990. At that time, the following persons each owned 12.5 percent of Greenwich: Politis, Kalikas, Kallergis, Zoumberakis, Gruber, Mark Slanta, Walt Slanta, and John Montgomery. Kallergis was Greenwich's president and Zoumberakis was chief executive officer in 1990. Zoumberakis signed Greenwich's 1990 corporate tax return. Senser picked up the scrap metal from Greenwich. Senser named Greenwich on the receipts for the scrap Senser bought from Greenwich. Greenwich received $ 9,479.70 of scrap income from Senser in 1990, of which $ 5,671.70 was cash and $ 3,808 was checks. Greenwich deposited the checks in its payroll checking accounts. Kallergis handled Greenwich's scrap metal sales to Senser. He picked up the cash scrap payments. Greenwich recorded and reported the check scrap income in its books and on its 1990 corporate tax return, but not the cash. Petitioner husbands concealed the scrap income from their accountants, secretaries, supervisors, foremen, and other employees except Bowman. E. Quality Mold's Accountants
1. James Leonello
James Leonello (Leonello) was Quality Mold's *245 controller and only internal accountant from September 1987 to May 1988. He established Quality Mold's computer system to track income and expense items. Leonello processed Quality Mold's accounts payable and invoices through the computer system and prepared monthly financial statements. He received no receipts for and did not know about Quality Mold's scrap income. 2. Donald Boatfield
Donald Boatfield (Boatfield), a certified public accountant (C.P.A.), was Quality Mold's only outside accountant in 1988. He prepared and signed, as return preparer, Quality Mold's 1986, 1987, and 1988 Federal income tax returns. He used Quality Mold's general ledgers to prepare Quality Mold's 1986, 1987, and 1988 financial statements and tax returns. Boatfield did not see any of Quality Mold's receipts for scrap income or know that Quality Mold had scrap metal to sell. He did not know whether Quality Mold made business enhancement payments. 3. Thomas Gedelian
Thomas Gedelian (Gedelian), a C.P.A., prepared Quality Mold's yearend financial statements and prepared and signed as return preparer Quality Mold's Federal income tax return for 1989. He also helped Quality Mold close its *246 books and make its yearend adjusted journal entries. Gedelian did not know whether Quality Mold received any income from selling scrap metal or paid any business enhancement payments in 1989. 4. Jerry Swejk
Jerry Swejk (Swejk), a C.P.A., has been Quality Mold's controller since September 1991 and was its controller at the time of trial. Before that, he worked as an accountant for Harry Donovan (Donovan). Donovan is a C.P.A., financial consultant, and entrepreneur. Swejk was Versitech's accountant when he began to work for Donovan. Swejk prepared and signed as return preparer Quality Mold's original 1990 return. When he did so, he did not know of the scrap income that he later included on Quality Mold's amended return for 1990. F. Quality Mold's Tax Returns and Audits
Quality Mold timely filed income tax returns for 1988 and 1989. It filed its 1990 return on May 13, 1991. Respondent first audited Quality Mold's 1989 tax year at the end of 1990 (first audit). The first audit included only a few expense items and no income items. The first audit went smoothly, and Quality Mold's representatives were very cooperative. Quality Mold's representatives provided *247 all the corporate books and records to and cooperated fully with respondent's agent, Alice Robinson (Robinson). After respondent learned that Quality Mold received scrap income, respondent examined Quality Mold's 1988 return in October 1991, to see whether it reported the income. After respondent determined that Quality Mold did not report the cash scrap income for 1988, respondent reopened 1989 and opened 1990 (second audit). Quality Mold's representatives did not cooperate during the second audit. Quality Mold's counsel, Joseph F. Timmons, from the law firm Russell & Andris, would not let Robinson interview petitioners or review Quality Mold's 1989 corporate records during the second audit. During the second audit, Quality Mold's employees did not allow Robinson to examine Versitech's records without her first asking for each item that she wanted to see. Swejk told Robinson that Harry Rock made all of its payments to Versitech by check. The second audit showed that Quality Mold did not report any of the cash scrap income it received in 1988, 1989, and 1990. Respondent issued the notices of deficiency to petitioners on December 31, 1992. On January 25, 1993, Quality Mold *248 filed amended returns for 1988, 1989, and 1990 in which it reported income from scrap sales and business enhancement payments. Quality Mold did not report all of the cash scrap income on its amended returns for 1988 and 1989. On its amended returns, Quality Mold reported as other income from "scrap proceeds" $ 208,494 for 1988, $ 195,540 for 1989, and $ 133,295 for 1990. On its amended returns, Quality Mold did not report scrap income of $ 18,009 for 1988 ($ 226,503 - $ 208,494) and $ 18,666 for 1989 ($ 214,206 - $ 195,540). Quality Mold deducted as business enhancement payments on its amended returns $ 218,000 for 1988, $ 200,930 for 1989, and $ 160,404 for 1990. OPINION A. Whether Quality Mold Made Business Enhancement Payments
Quality Mold is an S corporation, the tax attributes of which pass through to its shareholders. Sec. 1366(a)(1). Petitioners do not dispute that the unreported cash scrap income passed through Quality Mold to them. Rather, petitioners contend that there are no deficiencies because Quality Mold used the cash scrap income to make business enhancement payments. We must decide whether Quality Mold made business enhancement payments, and if so, *249 in what amount and whether they are deductible. No deduction is allowed under section 162 for payments to an official or employee of a foreign Government which are unlawful under the Foreign Corrupt Practices Act of 1977 or to any other person, if the payment constitutes an illegal bribe or kickback. Sec. 162(c)(1) and (2). The burden of proof as to whether a payment is an illegal bribe or kickback under that Act is on the Commissioner to the same extent as the Commissioner bears the burden of proof under section 7454 (regarding fraud). Sec. 162(c)(1); sec. 1.162-18, Income Tax Regs. Petitioners bear the burden of proving the amount of business enhancement payments they made. Rule 142(a); New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934). Taxpayers must substantiate claimed deductions and credits with adequate records. Sec. 6001; sec. 1.6001-1(a), Income Tax Regs. If petitioners prove the amount of business enhancement payments they made, respondent must prove by clear and convincing evidence that the payments are illegal bribes or kickbacks. Sec. 162(c)(1) and (2). We believe that Quality Mold made some business enhancement payments *250 based on the testimony of its officers and shareholders, and petitioners' experts John Thanopoulous (Thanopoulous) and Ingram Myers, Jr. (Myers). However, petitioners have not given us a reasonable basis to decide how much they paid. Petitioner husbands Zoumberakis, Kalikas, Gruber, Kallergis, and Politis each testified that Quality Mold made business enhancement payments because it was a prerequisite to conducting business overseas, but they gave us no credible basis to estimate the amounts. Politis testified that the payments ranged from $ 15 to $ 10,000. Gruber testified that they tried to pay as little as possible. Politis testified that they kept contemporaneous records of each business enhancement payment, but petitioners did not produce any such records. Kalikas testified that they kept no contemporaneous records of business enhancement payments. Gruber stated in an affidavit in support of petitioners' motion for a protective order that they kept no contemporaneous records of the business enhancement payments. Without credible records, we give little weight to Zoumberakis' testimony that Quality Mold made business enhancement payments of about $ 200,000 in 1988 and *251 1989. Petitioners argue that revealing the names of those who received "grease" payments would destroy their business abroad and would endanger petitioners and their families. Even if this were true, it would not relieve petitioners of their burden of proving the amount of business enhancement payments that Quality Mold made. [5]
Two of petitioners' expert witnesses, Thanopoulous and Myers, testified credibly that Quality Mold was probably required to make business enhancement payments to operate overseas. They testified that business enhancement payments are not customary but are not unusual. However, neither of them gave us any basis for estimating the amount of business enhancement payments made by Quality Mold *252 in 1988 and 1989. Thanopoulous indicated that small gifts were more common than large gifts. Petitioners contend that we should use the "Cohan rule" to estimate the amount of business enhancement payments that Quality Mold may deduct for 1988 and 1989. Cohan v. Commissioner, 39 F.2d. 540 (2d Cir. 1930). We must have a reasonable evidentiary basis for estimating business expenses under Cohan. Polyak v. Commissioner, 94 T.C. 337, 345-346 (1990); Vanicek v. Commissioner, 85 T.C. 731, 743 (1985). We are not convinced that petitioners' business enhancement payments equaled the amount of their cash scrap income for each year in issue. We have no reasonable basis to estimate the amount of Quality Mold's business enhancement payments. Thus, we do not apply the Cohan rule. B. Additions to Tax Under Section 6653(b) and Penalties Under Section 6663(a)
1. Background
Respondent determined that each of petitioner husbands is liable for the addition to tax for fraud under section 6653(b) for 1988 and the fraud penalty under section 6663(a) for 1989. A taxpayer is liable *253 for an addition to tax or penalty for fraud equal to 75 percent of the part of the underpayment which is attributable to fraud. Secs. 6653(b), 6663(a). Respondent has the burden of proving fraud by clear and convincing evidence. Sec. 7454(a); Rule 142(b). First, respondent must prove the existence of an underpayment. Parks v. Commissioner, 94 T.C. 654, 660 (1990). Respondent may not rely on petitioners' failure to carry the burden of proof as to the underlying deficiency. Id. at 660-661; Petzoldt v. Commissioner, 92 T.C. 661, 700 (1989). Second, respondent must show that petitioners intended to evade taxes they believed to be owing by conduct intended to conceal, mislead, or otherwise prevent tax collection. Stoltzfus v. United States, 398 F.2d 1002, 1004 (3d Cir. 1968); Parks v. Commissioner, supra at 661; Rowlee v. Commissioner, 80 T.C. 1111, 1123 (1983). 2. Underpayment
Quality Mold sold scrap metal to Senser for $ 226,503 in cash in 1988 and $ 214,206 in cash in 1989. It did not *254 deposit the income in any business account and did not record the cash scrap income in any books or records. It concealed the scrap income from its accountants and tax return preparers. Quality Mold did not report any of its cash scrap income on its Federal income tax returns or on the Schedules K-1 issued to petitioners. Quality Mold probably made business enhancement payments, but we are not convinced that the payments offset its unreported income. We conclude that respondent has proven that each petitioner husband underreported tax for 1988 and 1989. [6]
3. Fraudulent *255 Intent
Respondent must prove by clear and convincing evidence that each petitioner husband had fraudulent intent. Parks v. Commissioner, supra at 664. Each petitioner husband knew about the cash scrap sales in 1988 and 1989 which were unrecorded and unreported. They kept this information from their accountants, secretaries, supervisors, foremen, and other employees, except possibly Bowman, the driver, who received envelopes containing cash from Senser. Petitioner husbands were the only persons in Quality Mold who knew whether or to what extent Quality Mold was making business enhancement payments. Petitioner husbands worked together closely. The following discussion applies to each petitioner husband, unless otherwise noted. For purposes of section 6653(b), fraud means actual, intentional wrongdoing, Mitchell v. Commissioner, 118 F.2d 308, 310 (5th Cir. 1941), revg. 40 B.T.A. 424 (1939), or the intentional commission of an act for the specific purpose of evading a tax believed to be owing, Webb v. Commissioner, 394 F.2d 366, 377 (5th Cir. 1968), affg. T.C. Memo. 1966-81. *256 Fraud may be proven by circumstantial evidence because direct evidence of the taxpayer's intent is rarely available. Stephenson v. Commissioner, 79 T.C. 995, 1005-1006 (1982), affd. 748 F.2d 331 (6th Cir. 1984). The courts have developed a number of objective indicators or "badges" of fraud. Recklitis v. Commissioner, 91 T.C. 874, 910 (1988). Several badges of fraud are present in this case: (a) Substantially understating income for 3 years; (b) having inadequate books and records; (c) dealing in large amounts of cash; (d) using a fictitious name; (e) concealing scrap income from Quality Mold's accountants; (f) not cooperating with tax authorities; and (g) giving false, misleading, and inconsistent testimony at trial. Bradford v. Commissioner, 796 F.2d 303, 307-308 (9th Cir. 1986), affg. T.C. Memo. 1984-601; Ruark v. Commissioner, 449 F.2d 311, 312-313 (9th Cir. 1971), affg. T.C. Memo. 1969-48. a. Substantially Understating Income
A pattern of consistent and substantial *257 underreporting of income over a number of years is evidence of fraud. Holland v. United States, 348 U.S. 121, 137-139 (1954); Estate of Mazzoni v. Commissioner, 451 F.2d 197, 202 (3d Cir. 1971), affg. T.C. Memo. 1970-37; Rogers v. Commissioner, 111 F.2d 987, 989 (6th Cir. 1940), affg. 38 B.T.A. 16 (1938). Petitioners did not report cash scrap income for 1988, 1989, and 1990. Petitioners contend that they did not consistently underreport their income and that they had understatements for 1988 and 1989 but not for 1990. However, petitioners stipulated that, in 1990, the Versitech division of Quality Mold received but did not report cash scrap income of $ 39,389.46 from Senser. After respondent issued the notices of deficiency, Quality Mold filed an amended return for 1990 reporting additional scrap income of $ 133,295. The Court may consider evidence of the taxpayer's conduct reasonably close to the years in issue to decide whether the taxpayer is liable for the addition to tax for fraud. United States v. Johnson, 386 F.2d 630, 631 (3d Cir. 1967); *258 Tipton v. Commissioner, T.C. Memo. 1994-624; Kerr v. Commissioner, T.C. Memo. 1994-582; Tschudy v. Commissioner, T.C. Memo. 1993-567. We conclude that each of the petitioner husbands consistently underreported substantial amounts of income. b. Failing To Maintain Adequate Records
A taxpayer's failure to maintain accurate records is a badge of fraud. Merritt v. Commissioner, 301 F.2d 484, 487 (5th Cir. 1962), affg. T.C. Memo. 1959-172; Reaves v. Commissioner, 295 F.2d 336, 338 (5th Cir. 1961), affg. 31 T.C. 690 (1958); Grosshandler v. Commissioner, 75 T.C. 1, 20 (1980). Petitioners had no books or records of the scrap income that Quality Mold received or of their business enhancement payments. This badge of fraud applies to each petitioner husband because each one of them was an officer of Quality Mold and was highly involved in its affairs. This badge especially applies to Zoumberakis, Kalikas, and Gruber because they allegedly made *259 business enhancement payments for Quality Mold. Politis was secretary and Kallergis was treasurer for Quality Mold in 1988 and 1989. Kallergis knew of Quality Mold's operations as a corporate officer. He knew that it did not keep records. Petitioners point to the fact that Senser's records showed that Quality Mold received cash for scrap and that VHP was Quality Mold. However, the credit for that goes to Senser, not Quality Mold. Petitioner husbands stipulated they were aware that Quality Mold did not record the scrap receipts in its books and records in 1988, 1989, and 1990. c. Dealing in Large Amounts of Cash
A taxpayer's use of cash to conceal income is evidence of fraud. Bradford v. Commissioner, supra. We believe Quality Mold sold scrap for cash to conceal its income. It failed to report that it had cash scrap income. In 1990, Quality Mold received checks for scrap income totaling $ 17,455.63 that it deposited, recorded in its books and records, and reported on its original return. Each petitioner husband knew that Quality Mold received but did not record or report the cash scrap income. Petitioners contend that Quality Mold did *260 not use cash to conceal its scrap sales. We disagree. Quality Mold asked Senser to pay for scrap by check only after Senser disclosed the payments to respondent. They argue that they needed cash to make business enhancement payments. However, they could have withdrawn cash from their business bank accounts for that purpose. Petitioners contend that Quality Mold's use of only one scrap dealer, Senser, supports their position. Petitioners contend that they could have used many other dealers and left no paper trail. Petitioners also contend that Quality Mold's receipt of cash was not a secret because Senser and Quality Mold's officers and investors knew about the cash payments. Petitioners' arguments are not convincing in light of their many actions to conceal the cash. d. Using a Fictitious Name
Use of an alias is evidence of fraud. Lipsitz v. Commissioner, 21 T.C. 917, 937 (1954), affd. 220 F.2d 871 (4th Cir. 1955). Zoumberakis asked Senser to identify all scrap sales by Quality Mold as sales by VHP. Petitioners used the name VHP to conceal Quality Mold. Zoumberakis testified that he created VHP because he *261 gave Versitech a lot of machining to do and needed the scrap from Versitech to cover business enhancement payments. However, Mr. Senser and Manion both credibly testified that Zoumberakis asked Senser to identify all Quality Mold scrap sales as sales by VHP. Once the cash scrap payments were disclosed to respondent, Zoumberakis asked Senser to pay Quality Mold by check payable to Quality Mold. This badge of fraud applies to Zoumberakis. There is no evidence that any of the other petitioner husbands knew of VHP. e. Concealing Scrap Income From Return Preparers
Concealing income from a taxpayer's tax preparer can be evidence of fraud. Korecky v. Commissioner, 781 F.2d 1566, 1569 (11th Cir. 1986), affg. T.C. Memo. 1985-63; Farber v. Commissioner, 43 T.C. 407, 420, modified 44 T.C. 408 (1965). All three of Quality Mold's return preparers testified that they did not know about Quality Mold's cash scrap income from 1986 to 1990. Swejk, who worked for Donovan when Swejk prepared Quality Mold's original 1990 return, did not know about the scrap income. Gedelian *262 used information provided by Quality Mold to prepare the 1989 return. Boatfield did not know that Quality Mold had scrap to sell. Each petitioner husband knew about and concealed the cash scrap income from Quality Mold's return preparers. f. Refusal To Cooperate With Tax Authorities
A taxpayer's refusal to cooperate with the Commissioner's agents to determine the correct tax liability can indicate fraud. Bradford v. Commissioner, 796 F.2d 303 (9th Cir. 1986); Rowlee v. Commissioner, 80 T.C. at 1125; Grosshandler v. Commissioner, supra.
Petitioners contend that they fully disclosed Quality Mold's scrap sales to respondent's agent. We disagree. During the first audit of Quality Mold for 1989, petitioners and Quality Mold employees cooperated with respondent's agent, but did not tell respondent that Quality Mold received cash scrap income. Respondent independently learned that Quality Mold had cash scrap income. Respondent determined that Quality Mold did not report its cash income from scrap in 1988. Respondent then reopened the audit for Quality Mold's 1989 tax year and opened *263 an audit for 1990. Petitioners and Quality Mold's lawyers and employees did not cooperate during the second audit. g. False and Misleading Testimony
False, misleading, and inconsistent testimony is a badge of fraud. Bradford v. Commissioner, supra. Zoumberakis testified that Quality Mold began to sell scrap metal to Senser in 1988 or 1989. Mr. Senser and Manion testified that Quality Mold began selling scrap to Senser at the end of the 1970's or early 1980's. Zoumberakis testified that he asked for cash payments because Senser said all of its other customers were getting cash. Mr. Senser and Manion testified that Senser let its customers decide how the payments were to be made, and that Senser paid about half of its customers by check and half by cash in 1988 and 1989. We have no reason to doubt Mr. Senser's and Manion's testimony. Politis testified that he knew the amounts Kalikas and Gruber paid because they kept contemporaneous records of each business enhancement payment. However, petitioners did not produce any such records, and Kalikas and Gruber said that they kept no contemporaneous records of business enhancement payments. This *264 badge of fraud applies only to Zoumberakis and Politis. 4. Reliance on Donovan as a Defense to Fraudulent Intent
A taxpayer is not liable for the fraud addition to tax under section 6653(b) or penalty under section 6663 if the taxpayer relied in good faith on a qualified accountant and disclosed all material facts necessary to prepare a correct tax return. Alexander Shokai, Inc. v. Commissioner, 34 F.3d 1480, 1486 (9th Cir. 1994), affg. T.C. Memo. 1992-41; United States v. Whyte, 699 F.2d 375, 379-380 (7th Cir. 1983); United States v. Garavaglia, 566 F.2d 1056, 1060 (6th Cir. 1977); United States v. Jett, 352 F.2d 179 (6th Cir. 1965). None of petitioner husbands told Quality Mold's 1988 and 1989 return preparers about the cash receipts from scrap or business enhancement payments. However, petitioner husbands contend they are not liable for fraud because they relied on advice from Donovan. We disagree. There is no document in the record that states when Quality Mold's professional relationship with Donovan began. Donovan's *265 firm prepared Versitech's returns for taxable years 1988 and 1989 and first prepared Quality Mold's return for taxable year 1990. Donovan was not Quality Mold's accountant or return preparer for the years in issue. There is testimony that Donovan may have told petitioner husbands that they need not report income and deductions if they are a wash, but we cannot be certain when this occurred. There is no documentary evidence on this point. The testimony is self-serving and equivocal. Zoumberakis testified that he thought Donovan told him in 1988 that he did not have to report income and expenses if it was a wash. Donovan initially testified that petitioner husbands first spoke to him about Quality Mold's scrap income and business enhancement payments at a meeting when his firm was preparing Quality Mold's 1990 return. However, after a recess during which Zoumberakis told Donovan that they have known each other since 1987, Donovan testified that he first heard of Quality Mold's scrap income and business enhancement payments in 1987 or 1988. We put little stock in Donovan's changed testimony or his other testimony. He testified that he has advised many clients not to report all *266 of their income or deductions if these items resulted in a wash, and that he signed such returns as the preparer. Donovan's cavalier justification for this position is that a lot of people do it this way. We are not convinced that Donovan told petitioner husbands that they need not report income and deductions if they are a wash; if he did say that, we do not believe that Donovan did so before petitioner husbands filed their returns for the years in issue. A taxpayer cannot shift his responsibilities for deficiencies to an accountant from whom the taxpayer has withheld vital relevant information. United States v. Whyte, supra; United States v. Garavaglia, supra; Bender v. Commissioner, 256 F.2d 771, 774 (7th Cir. 1958), affg. T.C. Memo. 1957-121. Petitioner husbands did not give Donovan details about the cash scrap income and business enhancement payments, such as the amount of each payment and when Quality Mold received and made each payment. See Scallen v. Commissioner, 877 F.2d 1364, 1371 (8th Cir. 1989) (no defense *267 to fraud where taxpayer did not provide accountant with documentation of transactions), affg. T.C. Memo. 1978-412; Foster v. Commissioner, 391 F.2d 727, 732-733 (4th Cir. 1968), affg. in part and revg. in part T.C. Memo. 1965-246. Donovan testified that Zoumberakis told him that they were making business enhancement payments with receipts from scrap sales. Petitioner husbands do not claim that they paid Donovan for his advice or that his advice was written. The circumstances surrounding Donovan's purported advice are too vague to be credible, especially on behalf of a substantial business like Quality Mold with about $ 10 million in sales in 1989. Petitioner husbands do not claim to have tried to verify Donovan's qualifications. See Dailey v. Commissioner, T.C. Memo. 1985-169 (reliance on attorney no defense to fraud where taxpayer made no attempt to verify attorney's qualifications). Petitioner husbands' claim of reliance on Donovan is not credible. We conclude that respondent has proven by clear and convincing evidence that each petitioner husband is liable *268 for the addition to tax for fraud under section 6653(b) for 1988 and the penalty for fraud under section 6663(a) for 1989. C. Whether Petitioners Are Liable for Substantial Understatement of Tax for 1988
Respondent determined that petitioners are liable for additions to tax for substantial understatement of income tax under section 6661 for 1988. The addition is 25 percent of any underpayment attributable to a substantial understatement. Sec. 6661(a); Pallottini v. Commissioner, 90 T.C. 498 (1988). A substantial understatement is one which exceeds the greater of 10 percent of the tax required to be shown on the return or $ 5,000. Sec. 6661(b)(1). Accordingly, petitioners are liable for the additions to tax unless the understatements are to be reduced pursuant to section 6661(b)(2)(B)(i) or (ii). Petitioners contend that they did not substantially understate their income for 1988 and 1989 because Quality Mold's business enhancement payments offset its unreported cash receipts. Petitioners raise no other defense. [7] We hold that petitioners are liable for the additions to tax under section 6661.
*269 D. Accuracy-Related Penalty Under Section 6662(a) for 1989
Respondent determined that petitioners Efstratios and Angie Zoumberakis and Gregory and Stephanie Kalikas are liable for accuracy-related penalties under section 6662(a) for 1989. [8] Section 6662(a) provides that taxpayers are liable for a penalty equal to 20 percent of the portion of the underpayment to which section 6662 applies. Respondent contends that the accuracy-related penalty applies to Efstratios and Angie Zoumberakis because they stipulated that their income was $ 24,400 higher than they reported for 1989 due to a disallowed bad debt expense and disallowed professional fees. Respondent contends that the accuracy-related penalty applies to Gregory and Stephanie Kalikas because they stipulated that their income was $ 8,584 higher than they reported for 1989 because they received distributions from Mesta Diversified U.S.A., Inc. Section 6662(b)(2) provides that section 6662 applies to an underpayment attributable to any substantial understatement of income tax. A substantial understatement of income tax occurs when the amount of the understatement for the taxable year exceeds the greater of 10 percent *270 of the tax required to be shown or $ 5,000. Sec. 6662(d)(1)(A). Petitioners bear the burden of proving that they are not liable for the accuracy-related penalties. Rule 142(a). Petitioners contend that they were not negligent because the business enhancement payments offset the unreported income and that they relied on Donovan. However, that does not bear on whether section 6662(b)(2) applies here. We conclude that petitioners Efstratios and Angie Zoumberakis are liable for the accuracy-related penalty under section 6662(a) for 1989 with respect to the $ 24,000 adjustment to income, and Gregory and Stephanie Kalikas are liable for the accuracy-related penalty under section 6662(a) for *271 1989 with respect to the $ 8,584 adjustment to income. To reflect concessions, Decisions will be entered under Rule 155. Footnotes
1. Cases of the following petitioners are consolidated herewith: Efstratios and Angie Zoumberakis, docket No. 4812-93; Gregory Kalikas and Stephanie Kalikas, docket No. 4813-93; Ioannis Kallergis a.k.a. John I. Kallergis and Margi Kallergis, docket No. 4814-93; Michael Politis and Maria Politis, docket No. 4815-93.↩
1. Determined against Robert S. Gruber only.↩
2. Determined against Efstratios Zoumberakis only.↩
3. Determined against Gregory Kalikas only.↩
4. Determined against Ioannis Kallergis only.↩
5. Determined against Michael Politis only.↩
2. Petitioners refused to identify any person to whom they made business enhancement payments.↩
3. Petitioners concede that cash scrap receipts were $ 226,503 in 1988 and $ 214,206 in 1989.↩
4. The parties do not explain why these stipulated amounts do not total 100 percent.↩
5. We did not admit into evidence two documents which purport to state the amounts of business enhancement payments Quality Mold made in 1988 and 1989. The documents were hearsay, and no exception applied. The documents were not based on contemporaneous records and were prepared after the audit began.↩
6. Petitioners stipulated that Quality Mold received $ 226,503 in 1988 and $ 214,206 in 1989. After respondent issued the notices of deficiency in this case, Quality Mold filed amended Forms 1120S for 1988 and 1989 in which it claimed it made business enhancement payments of $ 218,000 in 1988 and $ 200,930 in 1989. Even if Quality Mold made the claimed business enhancement payments, it understated its income by $ 8,503 in 1988 and $ 13,276 in 1989.↩
7. Petitioners did not request and do not argue that respondent should waive this addition to tax. Sec. 6661(c); see Mailman v. Commissioner, 91 T.C. 1079, 1082-1084↩ (1988).
8. Sec. 6662 does not apply to any part of an underpayment on which a penalty is imposed under sec. 6663. Sec. 6662(b). We have found petitioner husbands liable for the penalty under sec. 6663 for the underpayment due to the omitted scrap income. Thus, sec. 6662 does not apply to petitioners for that part of the underpayment.↩