T.C. Memo. 1997-570


UNITED STATES TAX COURT


WILLIAM C. BERETTA, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 11615-94.                    Filed December 29, 1997.


William C. Beretta, pro se.

<u>Andrew P. Crousore</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

GERBER, <u>Judge</u>:  Respondent determined deficiencies in petitioner's Federal income tax and additions to tax and penalties for fraud as follows:

| | | Additions to Tax and Penalties | | | |
|---|---|---|---|---|---|
| Year | Deficiency | Sec. 6653(b)(1)(A) | Sec. 6653(b)(1) | Sec. 6653(b)(1)(B) | Sec. 6663 |
| 1987 | $5,115 | $5,802 | – | [1] | – |
| 1988 | 10,058 | – | $7,544 | – | – |
| 1989 | 16,448 | – | – | – | $12,336 |
| 1990 | 15,437 | – | – | – | 11,578 |

[1] In addition, with respect to the taxable year 1987, respondent has determined an addition to tax pursuant to sec. 6653(b)(1)(B) in an amount equal to 50 percent of the interest due on the underpayment attributable to fraud.

The issues for our consideration are: (1) Whether petitioner was required to report as income money received from two restaurants during the years at issue; (2) whether petitioner failed to report dividend income from jointly held mutual funds for 1988, 1989, and 1990; (3) whether petitioner received $2,000 in unreported income as a result of preparing a U.S. Individual Income Tax Return, Form 1040, in the name of Chris Arias; (4) whether respondent properly denied petitioner's claimed capital losses of $2,858, $3,000, $3,000, and $2,400 for 1987, 1988, 1989, and 1990, respectively; (5) whether petitioner was entitled to claim his mother as a dependent on his 1990 Federal income tax return; (6) whether petitioner was entitled to certain claimed itemized deductions for 1987, 1988, 1989, and 1990, respectively; and (7) whether any part of any underpayment of tax on petitioner's returns for the taxable years 1987 through 1990 was due to fraud.

## FINDINGS OF FACT[1]

At the time the petition in this case was filed, petitioner, Mr. William Beretta, resided in Salinas, California. Petitioner claimed head of household filing status for each of the years at issue.

### 1. Skimmed Proceeds

Mr. Beretta was employed by the Internal Revenue Service (IRS), Collection Division, from 1965 to 1994, as a revenue officer. Mr. Beretta was trained to identify tax examination situations and to inform taxpayers of their obligation to pay taxes. In particular, Mr. Beretta conducted investigations of taxpayers who had failed to file tax returns. In addition to his employment with the IRS, Mr. Beretta also invested in several restaurants. During the years at issue, petitioner owned an interest in three restaurants: The Salinas Peppertree Restaurant, the Seaside Bobby Rodgers Steak and Gourmet Burgers, and the Atascadero Peppertree Restaurant.

Mr. Beretta was a principal in a corporation known as HRB Enterprises, Inc. (HRB Enterprises). The three principals in the corporation were Randy Hurst (H), Bobby Rodgers (R) and Mr. Beretta (B). HRB Enterprises operated various restaurants in Atascadero, Fresno, and Salinas, California. On August 14, 1984,

---

[1] The stipulation of facts and the attached exhibits are incorporated by this references.

Mr. Beretta became an equity owner of a Peppertree Restaurant in Salinas when the restaurant was purchased by HRB Enterprises from Denny's, Inc. Mr. Beretta provided the majority of capital to acquire the Salinas Peppertree Restaurant. In early 1985, Mr. Beretta advanced an additional $70,000 to HRB Enterprises. This advance was evidenced by two promissory notes from HRB Enterprises that were payable on demand.

In late 1985, Mr. Beretta discovered that Randy Hurst and Bobby Rodgers were embezzling money from several of the restaurants that were owned by HRB Enterprises. As a result of a negotiated settlement, Mr. Beretta received two restaurants that were previously owned by HRB Enterprises, the Salinas Peppertree Restaurant and Seaside Bobby Rodgers Steak and Gourmet Burgers.

In September 1986, Mr. Beretta entered into an agreement with William Arias whereby a new corporation would be formed to take over the Salinas Peppertree Restaurant. Mr. Beretta and Mr. Arias formed DOBRA Enterprises, Inc., by recording articles of incorporation, but they never completed the incorporation process.

Mr. Beretta and Mr. Arias agreed that Mr. Arias would contribute the expertise, and Mr. Beretta would contribute the restaurant business, for which they would each receive a share of the profits. Throughout the period 1987 to April 30, 1991, Mr. Beretta was fully involved in the operation and supervision

of the Salinas Peppertree Restaurant.  Mr. Beretta reflected a 50-percent ownership of the Salinas Peppertree Restaurant as a personal asset on a 1990 loan application.

Mr. Beretta and William Arias agreed that they would "skim" money directly from the restaurant's cash register.  The parties decided that Mr. Beretta would receive the majority of the skimmed proceeds in the beginning.  The arrangement was for Mr. Beretta to receive 75 percent and William Arias to receive 25 percent of the skimmed proceeds during 1987, 1988, and 1989. During 1990, Mr. Beretta and Mr. Arias split the skimmed proceeds equally.  Mr. Beretta instructed Pat Bartley, the manager of the Salinas Peppertree Restaurant, to remove however much currency the restaurant could afford.  Mr. Beretta ordered Ms. Bartley to account for the skimmed proceeds as a miscellaneous expense in the daily sales book.  This column was also used to account for cash payments to employees.

Ms. Bartley removed between $50 and $200 a day for Mr. Beretta.  Mr. Beretta instructed Ms. Bartley to put the currency in an envelope and to place the envelope inside the safe at the restaurant.  Mr. Beretta advised Ms. Bartley that the money was repayment to him for the money that he had invested in the restaurant.  Mr. Beretta came into the restaurant every 2 or 3 days and collected the currency.

In January of 1986, Mr. Beretta invested $30,000 to open a Peppertree Restaurant in Atascadero, California. Mr. Beretta's partner in this venture was Garlo Enterprises, Inc., a wholly owned corporation of Gary Longfellow. Although the Atascadero Peppertree Restaurant was owned by Garlo Enterprises, Inc., Mr. Beretta was the primary financial force behind the restaurant. Garlo Enterprises, Inc., and Mr. Beretta formed a partnership to operate the Atascadero Peppertree Restaurant. Mr. Beretta assisted in the preparation of Garlo Enterprises, Inc.'s, corporate tax returns (Forms 1120) for the years 1986 through 1992.

Mr. Beretta and Mr. Longfellow agreed to split the profits from the Atascadero Peppertree Restaurant equally. Mr. Beretta suggested to Mr. Longfellow that they "skim" money from the cash register in order to avoid paying taxes on any profits from the restaurant. Mr. Longfellow agreed, and he began removing between $100 and $200 a day from the cash register, depending on the restaurant's cash-flow. At the end of the day, Mr. Longfellow would place Mr. Beretta's money in a bag for Mr. Beretta to come by and retrieve.

In order to account for the skimmed proceeds, Mr. Longfellow would make false overrings on the cash register and then remove an amount of cash equal to the false overring. Therefore, the skimmed profits were not reported on the restaurant's books.

Mr. Beretta would stop by the restaurant occasionally in order to retrieve his share of the skimmed proceeds.  On October 25, 1993, Mr. Beretta pleaded guilty to a Federal criminal conflict of interest charge for abating a tax bill of the Atascadero Peppertree Restaurant.

Respondent conducted a bank deposits analysis[2] in order to calculate the amount of unreported income, including skimmed proceeds, that Mr. Beretta received.  The amount of unreported income calculated and determined for the years at issue is as follows:

| Year | Skimmed Proceeds |
|------|------------------|
| 1987 | $11,835.61 |
| 1988 | 19,080.65 |
| 1989 | 37,482.13 |
| 1990 | 35,124.67 |
| Total | 103,523.06 |

2.  Dividend Income

During the years at issue, petitioner maintained investment accounts with Franklin Money Fund and Strong Total Return Funds. The accounts were established with petitioner's funds. Petitioner held one of the accounts as custodian for his daughter, Jennifer Beretta, and three accounts in joint tenancy with Jennifer Beretta.  On his 1987 tax return, petitioner

---

[2] The bank deposits analysis is conducted by examining deposits into an individual's bank account.  Reported income and any nontaxable items are subtracted from total deposits in order to determine unreported income.

reported a $2,558 capital loss with respect to one of the Strong Total Return Fund Accounts he held in joint tenancy with his daughter.  In addition, petitioner listed said accounts as his assets on loan applications prepared and filed during the period at issue.  The accounts produced the following dividends for the years at issue:

| Account | 1988 Dividends | 1989 Dividends | 1990 Dividends |
|---------|----------------|----------------|----------------|
| Franklin Money Fund Acct. No. 11100662247 | $2,051.29 | $3,460.72 | $2,849.23 |
| Strong Fund Acct. No. 021-2021885157 | 128.38 | 135.89 | --- |
| Strong Fund Acct. No. 023-2300221719 | 901.56 | 1,157.64 | 1,010.55 |
| Strong Fund Acct. No. 028-2800101143 | 42.34 | 409.37 | 561.85 |
| Total Dividends | 3,123.57 | 5,163.62 | 4,421.63 |

The dividend amounts shown above were reported on Jennifer Beretta's income tax returns for the years at issue.  Respondent determined that petitioner maintained control of the investment accounts, and therefore included the dividend amounts in petitioner's income for taxable years 1988, 1989, and 1990 respectively.

## 3.  Income Tax Refund

Petitioner participated in a scheme to defraud the U.S. Government.  Specifically, petitioner and William Arias fraudulently prepared and filed a 1987 Federal tax return claiming a refund under the name Chris Arias.  Chris Arias, William Arias' brother, never received the $4,168 refund check from the return that was filed on his behalf.  Instead, William Arias received the check, cashed it, and delivered $2,000 in cash to Mr. Beretta for his participation in the scheme.  Mr. Beretta did not report the $2,000 as income on his 1988 Federal individual income tax return.  Respondent included the $2,000 in petitioner's income for the 1988 taxable year.

## 4.  Capital Losses

On his 1987 tax return, petitioner claimed a capital loss from the sale of stock in a Strong Total Return Fund in the amount of $2,558.  At trial, petitioner presented documentary evidence substantiating the claimed loss.  Respondent disallowed the $2,558 loss in his 1987 notice of deficiency.

Petitioner claimed capital losses of $300, $3,000, $3,000 and $2,400 from bad debts for the tax years 1987, 1988, 1989, and 1990, respectively.  The bad debts were the result of petitioner's payments to creditors for obligations of the restaurants for which he was a guarantor.  In 1987, petitioner paid $300 for liabilities owed to PG&E, an electrical supplier of

one of the restaurants in which petitioner owned an interest. In 1989, petitioner paid $400 for liabilities owed to a local garbage company. Petitioner paid $3,000 and $2,400 in the years 1989 and 1990, respectively, on a Wells Fargo Bank loan that was taken out when petitioner acquired an interest in the Bobby Rodgers Steak and Gourmet Burgers restaurant. Petitioner made those loan payments when the restaurant was unable to make the payments out of its own funds. Respondent disallowed the claimed capital losses for all 4 years.

5.  Dependent

Petitioner claimed his mother, Edith Beretta, as a dependent on his 1990 income tax return. Mrs. Beretta suffered a stroke in 1989, as a result of which she moved into petitioner's home. Mrs. Beretta resided with petitioner from January 1, 1990, until October 10, 1990, at which time she returned to the hospital. Respondent determined that Mrs. Beretta was not a dependent of petitioner.

6.  Deductions

Petitioner claimed expenses for legal fees in connection with his ownership of various restaurants in the amounts of $1,464, $8,354, $10,004, and $3,000 for the tax years 1987, 1988, 1989, and 1990, respectively. Petitioner expended $1,464, $8,006, $8,267, and $3,000 for legal expenses for the tax years 1987, 1988, 1989, and 1990, respectively. The legal expenses

were incurred in defending suits from the restaurants' creditors. Respondent disallowed the claimed expenses for all 4 years.

In addition, petitioner claimed medical expenses in the amount of $3,524 for amounts paid on behalf of his mother, Edith Beretta, in 1990. Respondent determined that Edith Beretta was not a dependent of petitioner and accordingly denied petitioner's deduction for the claimed medical expenses.

OPINION

## Issue 1. Skimmed Proceeds

Initially, we must decide whether petitioner's receipt of cash from the two restaurants constituted taxable income. The accuracy of respondent's bank deposits analysis is not at issue because petitioner has conceded that he has received approximately $103,000 in cash from the Salinas and Atascadero Peppertree Restaurants during the years at issue.

Petitioner claims that the skimmed proceeds were repayment for amounts loaned to the two restaurants, and, therefore, the receipt of the cash constituted a nontaxable repayment of the loan principal. In addition, Mr. Beretta contends that he received no interest on the amounts lent. Respondent contends that the transfers of funds to the restaurants were not loans and that petitioner's receipt of the skimmed proceeds constituted taxable income. We agree with respondent.

Although we are not deciding a debt versus equity question, we find that the test used by this Court in deciding that issue will be useful in deciding whether petitioner's transfers of funds to the restaurants constituted loans.  The question of whether a transfer of funds to a closely held business constitutes debt or equity must be decided on the basis of all relevant factors.  Dixie Dairies Corp. v. Commissioner, 74 T.C. 476, 493 (1980). Courts look to the following nonexclusive factors to evaluate the nature of transfers of funds to closely held businesses:  (1) The names given to the documents evidencing the purported loans; (2) the presence or absence of fixed maturity dates with regard to the purported loans; (3) the likely source of any repayments; (4) whether the taxpayers could or would enforce repayment of the transfers; (5) whether the taxpayers participated in the management of the business as a result of the transfers; (6) whether the taxpayers subordinated their purported loans to the loans of the corporation's creditors; (7) the intent of the taxpayers and the corporations; (8) whether the taxpayers who are claiming creditor status were also shareholders of the corporations; (9) the capitalization of the corporations; (10) the ability of the corporations to obtain financing from outside sources at the time of the transfers; (11) how the funds transferred were used by the corporations; (12) the

failure of the corporations to repay; and (13) the risk involved in making the transfers. Id.

These factors serve only as aids in evaluating whether transfers of funds to a closely held business should be regarded as capital contributions or as bona fide loans. Boatner v. Commissioner, T.C. Memo. 1997-379. No single factor is controlling. Dixie Dairies Corp. v. Commissioner, supra. As expressed by this Court, the ultimate question is "Was there a genuine intention to create a debt, with a reasonable expectation of repayment, and did that intention comport with the economic reality of creating a debtor-creditor relationship?" Litton Business Sys., Inc. v. Commissioner, 61 T.C. 367, 377 (1973).

We find that Mr. Beretta's transfers of funds to the entities that controlled the Atascadero and Salinas Peppertree Restaurants were not loans. Only the factors material to our decision will be discussed.

First, the notes that evidenced the contributions to HRB Enterprises had no maturity date. The absence of a maturity date with respect to a note weighs against finding that the transfers were loans. Stinnett's Pontiac Serv., Inc. v. Commissioner, 730 F.2d 634, 638 (11th Cir. 1984), affg. T.C. Memo. 1982-314.

Second, the source of "repayments" for the transfers was highly unusual. Mr. Beretta had employees skim money directly from the cash registers on his behalf. No repayment schedule

existed for the purported loans, and no record was ever kept of the amount of money that Mr. Beretta was receiving from the two restaurants. In addition, the amount of money that Mr. Beretta skimmed each month depended directly upon the earnings of the restaurants. These factors indicate that the transfers were not loans and that the repayments were not loan repayments. Id.

Third, Mr. Beretta concedes that he never received interest payments on the alleged loans. "[A] true lender is concerned with interest." Curry v. United States, 396 F.2d 630, 634 (5th Cir. 1968). If the lender does not insist on interest payments, he is, therefore, "interested in the future earnings of the corporation or the increased market value of his interest." Id. Moreover, while the notes evidencing the transfers called for interest payments, none were actually made. The absence of interest supports our ultimate finding that the advances were not loans.

Based on all of the facts and circumstances surrounding the transfer of funds, we hold that Mr. Beretta's transfers to the restaurants were not loans. Further, the skimming payments to petitioner were being divided with his coowners based on ownership. In that regard, there is no evidence that petitioner's coowners also had made any advances that could be considered loans.

Finally, petitioner disregarded the business form and entity of the respective restaurants and, as relevant here, used the assets and income of the restaurants as his own.  Petitioner does not deny that the skimmed proceeds were converted to his own use. He had complete and unfettered use of the skimmed proceeds, and therefore the receipt of the skimmed proceeds constituted income within the meaning of section 61.[3]

Issue 2.  Dividend Income

The next issue for our consideration is whether petitioner failed to report dividend income from certain jointly held mutual funds for 1988, 1989, and 1990.  Petitioner held one of the mutual fund accounts as custodian for his daughter, Jennifer Beretta, and three accounts in joint tenancy with her. Resolution of this issue turns on who is the true owner of the income-producing property.  The owner of property for Federal income tax purposes is a question of fact to be determined from an examination of all the facts and circumstances.  Hang v. Commissioner, 95 T.C. 74, 80 (1990).  In determining the identity of the owner of the property, we may look to beneficial ownership instead of mere legal title.  Serianni v. Commissioner, 80 T.C. 1090, 1104 (1983), affd. 765 F.2d 1051 (11th Cir. 1985).  It is

---

[3] Unless otherwise indicated, all section references are to the Internal Revenue Code for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

command over the property or the enjoyment of its economic benefits that marks the real owner.  Hang v. Commissioner, supra.

The accounts were created with petitioner's personal funds. When a parent holds an account in joint tenancy with his child, or as guardian for his child, income from the account that is used to support the child is taxable to the person who is legally liable for such support.  Garriss Inv. Corp. v. Commissioner, T.C. Memo. 1982-38.  Courts apply strict scrutiny to transactions between related parties to prevent the shifting of income into lower tax brackets.  Doxey v. Commissioner, T.C. Memo. 1991-150, affd. without published opinion 979 F.2d 1534 (5th Cir. 1992). Mr. Beretta did not show whether he had a support obligation for his daughter or that he was not the beneficial owner of the accounts.  We also find it persuasive that petitioner claimed losses from the accounts on his tax returns, while the income from the accounts was reported on his daughter's returns. Accordingly, Mr. Beretta is taxable on the dividend income credited to the accounts during the taxable years at issue.

Issue 3.  Income Tax Refund

The next issue for our consideration is whether petitioner received $2,000 in unreported income in connection with his preparation of a false U.S. Individual Income Tax Return, Form 1040, in the name of Chris Arias.  Mr. Beretta and William Arias participated in a scheme to defraud the U.S. Government by

fraudulently preparing and filing a 1987 Federal tax return claiming a refund under the name of Chris Arias. Mr. Beretta received $2,000 for his part in the scheme. Gross income includes funds derived from legal and illegal sources. Rutkin v. United States, 343 U.S. 130 (1952). Accordingly, the $2,000 should be included in petitioner's income for the 1988 taxable year.

Issue 4. Capital Losses

We next must decide whether petitioner is entitled to claimed capital losses for the years at issue. On his 1987 tax return, petitioner claimed a $2,558 capital loss from the sale of stock in the Strong Total Return Fund. We have already decided that petitioner was the owner of the mutual funds for Federal tax purposes. At trial, petitioner presented documentary evidence substantiating the claimed loss. We find that petitioner is entitled to the $2,558 capital loss. Sec. 165(f).

Petitioner claimed capital losses of $300, $3,000, $3,000 and $2,400 from bad debts for the tax years 1987, 1988, 1989, and 1990, respectively. The bad debts were the result of payments made for liabilities to creditors of the restaurants for which Mr. Beretta was a guarantor. Payments by an individual on a guaranty of a debt which are not then repaid to the guarantor may give rise to a bad debt deduction if the debt to the guarantor is worthless. Tolzman v. Commissioner, T.C. Memo. 1981-689; sec.

1.166-8, Income Tax Regs. Whether or not a debt has become worthless within a particular year is a question of fact, the burden of proving which rests upon the petitioner. American Offshore, Inc. v. Commissioner, 97 T.C. 579, 593 (1991).

Petitioner has offered no evidence that the restaurants' obligation to repay him for amounts paid became worthless in the years claimed by petitioner. In addition, petitioner's claim that the obligation to repay him became worthless contradicts his claim that he received thousands of dollars in loan repayments from the restaurants during the years at issue. Accordingly, respondent's denial of the bad debt deduction with respect to these guaranty payments is sustained.

Issue 5. Dependent

The next issue for our consideration is whether petitioner was entitled to claim his mother, Edith Beretta, as a dependent on his 1990 income tax return. Section 151(c)(1)(A) allows a taxpayer to claim an exemption for each dependent (as defined in section 152) whose gross income is less than the exemption amount. Section 152(a)(4) defines the term "dependent" to include the mother of a taxpayer who receives over one-half of her support from the taxpayer during the taxable year. Petitioner bears the burden of showing that he is entitled to claim his mother as a dependent. Collins v. Commissioner, T.C. Memo. 1994-409.

Petitioner has failed to show that he is entitled to claim his mother as a dependent. Petitioner did not substantiate that he provided over one-half of his mother's support, nor did he provide any evidence that his mother's gross income was less than the exemption amount. Thus, we sustain respondent on this issue and hold that petitioner is not entitled to claim his mother as a dependent.

Issue 6. Deductions

We next consider whether petitioner is entitled to various claimed itemized deductions for the years at issue. Petitioner claimed deductions for legal fees in connection with his ownership of several restaurants in the amounts of $1,464, $8,354, $10,004, and $3,000 for the tax years 1987, 1988, 1989, and 1990, respectively.

Section 162(a) provides for a deduction for "ordinary and necessary" expenses paid or incurred during the taxable year in carrying on a trade or business. Sanford v. Commissioner, 50 T.C. 823, 826 (1968), affd. per curiam 412 F.2d 201 (2d Cir. 1969). An ordinary and necessary expense is one that is appropriate and helpful to the taxpayer's business and that results from an activity which is a common and accepted practice. Boser v. Commissioner, 77 T.C. 1124, 1132 (1981), affd. without published opinion (9th Cir. 1983). Legal fees are deductible under section 162(a) if they arise in connection with or

proximately from the taxpayer's trade or business. Peters, Gamm, West & Vincent, Inc. v. Commissioner, T.C. Memo. 1996-186.

Deductions are a matter of legislative grace, and petitioner bears the burden of proving that he is entitled to the deductions claimed. Rule 142(a); INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992). At trial, petitioner presented testimony substantiating legal expenses in connection with his ownership of the restaurants of $1,464, $8,006, $8,267, and, $3,000 for the tax years 1987, 1988, 1989, and 1990. Petitioner incurred the legal expenses defending his business from creditors' suits. Accordingly, petitioner is entitled to deduct legal expenses in the above-listed amounts.

We reach a different result with respect to the $3,524 in medical expenses that petitioner claimed on his 1990 return for amounts paid on behalf of his mother. Since we have determined that petitioner's mother is not a dependent of petitioner, petitioner is not entitled to deduct medical expenses paid on her behalf. Sec. 213(a). Therefore, we sustain respondent's determination with respect to this issue.

Issue 7.  Fraud Additions to Tax and Penalty

Finally, we consider whether any part of the underpayment of tax required to be shown on petitioner's returns was due to fraud. Respondent determined that the underpayment of tax was due to fraud under the statute applicable for each taxable year:

section 6653(b)(1) for 1987[4] and 1988, and section 6663 for 1989 and 1990.  These sections impose an addition to tax or penalty equal to 75 percent of the portion of the underpayment which is attributable to fraud.  However, if respondent proves that any portion of the underpayment is attributable to fraud, the entire underpayment shall be treated as attributable to fraud, unless petitioner can establish by a preponderance of the evidence that a portion is not attributable to fraud.  Secs. 6653(b)(2), 6663(b).

Fraud is defined as an intentional wrongdoing designed to evade tax believed to be owing.  Edelson v. Commissioner, 829 F.2d 828, 833 (9th Cir. 1987), affg. T.C. Memo. 1986-223. Respondent has the burden of proving fraud by clear and convincing evidence.  Rule 142(b).  To satisfy this burden, respondent must prove that petitioner intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of taxes.  Parks v. Commissioner, 94 T.C. 654, 661 (1990).

The existence of fraud is a question of fact to be resolved upon consideration of the entire record.  DiLeo v. Commissioner, 96 T.C. 858, 874 (1991), affd. 959 F.2d 16 (2d Cir. 1992).  Fraud

---

[4] In addition, with respect to the taxable year 1987, respondent has determined an addition to tax pursuant to sec. 6653(b)(1)(B) in an amount equal to 50 percent of the interest due on the underpayment attributable to fraud.

is never presumed and must be established by independent evidence of fraudulent intent. Edelson v. Commissioner, supra. Fraud may be shown by circumstantial evidence because direct evidence of the taxpayer's fraudulent intent is seldom available. Gajewski v. Commissioner, 67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978). The taxpayer's entire course of conduct may establish the requisite fraudulent intent. Stone v. Commissioner, 56 T.C. 213, 223-224 (1971); Otsuki v. Commissioner, 53 T.C. 96, 105-106 (1969).

Courts have developed several indicia of fraud, or "badges of fraud", which include: (1) Understatement of income, (2) inadequate books and records, (3) failure to file tax returns, (4) implausible or inconsistent explanations of behavior, (5) concealment of assets, (6) failure to cooperate with tax authorities, (7) filing false Forms W-4, (8) failure to make estimated tax payments, (9) dealing in cash, (10) engaging in illegal activity, and (11) attempting to conceal illegal activity. Bradford v. Commissioner, 796 F.2d 303, 307 (9th Cir. 1986), affg. T.C. Memo. 1984-601; Recklitis v. Commissioner, 91 T.C. 874, 910 (1988). This list is nonexclusive. Miller v. Commissioner, 94 T.C. 316, 334 (1990).

The strongest evidence of fraud in this case is the method in which petitioner received income from the restaurants. Petitioner instructed Pat Bartley, the manager of the Salinas

Peppertree Restaurant, to remove cash directly from the restaurant's cash register and place the money in an envelope. Mr. Beretta ordered Ms. Bartley to account for the skimmed proceeds as a miscellaneous expense in the daily sales book.

In addition, petitioner suggested to Mr. Longfellow that they skim money directly from the Atascadero Peppertree Restaurant cash register. In order to account for the skimmed proceeds, Mr. Longfellow would make false overrings on the cash register and then remove an amount equal to the false overring.

We find that petitioner's entire course of conduct reveals that he willfully intended to conceal income and prevent the collection of tax he knew was owing on the skimmed income. Petitioner skimmed money directly from the cash registers in order to make it difficult to determine that he was receiving income from the restaurants and to ensure that no record existed of the amount of money that he was deriving from the restaurants. In addition, petitioner received all of his income from the restaurant in cash in order to make the detection of skimming activity more difficult. Petitioner also ensured that his name was not on any of the business records for any of the restaurants in which he was involved. Fraud may be inferred from conduct intended to conceal income. Gajewski v. Commissioner, supra; Stone v. Commissioner, supra at 224.

We also find it persuasive that the skimming from the restaurants continued for a number of years. Courts have held that consistent understatements of income in substantial amounts over a number of years by knowledgeable taxpayers are persuasive evidence of fraudulent intent to evade taxes. Baumgardner v. Commissioner, 251 F.2d 311, 322 (9th Cir. 1957), affg. T.C. Memo. 1956-112; Otsuki v. Commissioner, supra at 107-108.

Another important factor in this case is Mr. Beretta's knowledge of the tax laws. The intelligence and sophistication of the taxpayer, especially his knowledge of the tax laws, is an important factor in determining whether he committed fraud. Scallen v. Commissioner, 877 F.2d 1364, 1370-1371 (8th Cir. 1989), affg. T.C. Memo. 1987-412. Mr. Beretta was employed by the Internal Revenue Service as a revenue officer for nearly 30 years. Mr. Beretta was trained to identify tax examination situations and to inform taxpayers of their obligation to pay taxes. In addition, he investigated taxpayers who had failed to file tax returns.

Petitioner asserts that he honestly believed that the proceeds were repayment for interest-free loans made to the restaurants. We find it difficult to believe that a person with petitioner's knowledge of tax law would not know that the receipt of cash directly from the cash registers of the restaurants he owned was not taxable. There was no loan schedule nor were there

any records of the amounts that petitioner was receiving. Nothing in the entire course of conduct surrounding these payments indicates that a legitimate loan was being repaid.

Based upon these indicia, we find that respondent has carried the burden of showing by clear and convincing evidence that petitioner's failure to report income for 1987, 1988, 1989, and 1990 was fraudulent with the intent to evade his tax. Because we have found that respondent has proven fraud with respect to portions of the underpayments, the entire underpayments shall be treated as attributable to fraud because petitioner has not established by a preponderance of the evidence that any portion is not attributable to fraud.  Secs. 6653(b)(2), 6663(b).

To reflect the foregoing,

Decision will be entered under Rule 155.